**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>GENESIS HEALTHCARE, INC., et al.,[1]<br><br>                              Debtors. | Chapter 11<br><br>Case No. 25-80185 (SGJ)<br>(Jointly Administered) |
| SUNBRIDGE GARDENDALE HEALTH CARE CENTER, LLC and GENESIS HEALTHCARE, INC.,<br><br>                              Plaintiffs,<br><br>    v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, MEHMET OZ, in his official capacity as Administrator of the Centers for Medicare and Medicaid Services, and CENTERS FOR MEDICARE AND MEDICAID SERVICES,<br><br>                              Defendants. | Adversary Proceeding No. _____ |

## COMPLAINT

Genesis Healthcare, Inc. ("Genesis") and certain of its affiliates and subsidiaries, as debtors

and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Plaintiffs"),

bring this complaint ("Complaint") against Robert F. Kennedy, Jr., in his official capacity as

---

[1] The last four digits of Genesis Healthcare, Inc.'s federal tax identification number are 4755. There are 299 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Genesis. The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

Secretary of Health and Human Services, the United States Department of Health and Human Services, Dr. Mehmet Oz, in his official capacity as Administrator of the Centers for Medicare and Medicaid Services, and the Centers for Medicare and Medicaid Services (collectively, "<u>Defendants</u>") and allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this adversary complaint to ensure that the residents of the Magnolia Ridge skilled nursing facility will not be abruptly removed from their home and that the facility may continue to serve patients during the pendency of these bankruptcy proceedings and any necessary further agency proceedings.

2.      Genesis is a leading provider of healthcare services from short-term to long-term and a wide variety of living options and professional clinical services. As part of these operations, Genesis's subsidiary Sunbridge Gardendale Health Care Center, LLC operates Magnolia Ridge Center, a 148-bed skilled nursing facility in Gardendale, Alabama ("<u>Magnolia Ridge</u>"). The facility offers post-hospital, short-term rehabilitation as well as long-term and respite care services.

3.      A mere two months after the Plaintiffs filed a petition under Chapter 11, the Centers for Medicare and Medicaid Servies ("<u>CMS</u>") issued a notice that it would be terminating Magnolia Ridge's provider agreement (the "<u>Provider Agreement</u>") as of September 15, 2025 at 11:59 PM. As a result of that termination, Magnolia Ridge would no longer receive payment for services provided to Medicare and Medicaid residents, all but guaranteeing the closure of the facility and transfer of existing residents from their homes to new facilities that also maintain a reasonable quality of care. CMS attempted to justify that termination on the basis of an alleged "immediate jeopardy" to a patient that occurred more than four months ago—before Plaintiffs overhauled Magnolia Ridge's leadership—and before Plaintiffs presented and immediately implemented a comprehensive plan of correction for that incident. That is, the supposed "immediate jeopardy"

identified on August 23, 2025, was based on an incident that occurred in May 2025, had not re-curred since, and for which Magnolia Ridge implemented a comprehensive correction plan. In other words, this is an issue of *past* non-compliance, not something that poses immediate jeopardy to any resident. CMS nonetheless pressed forward with termination of the Provider Agreement instead of finding substantial compliance and allowing Magnolia Ridge to resume serving new patients. CMS also refused to approve Magnolia Ridge's draft letter informing families of the potential closure, causing further uncertainty for the facility's residents and their families.

4.      CMS's termination notice was unlawful under the Bankruptcy Code multiple times over. To begin, CMS's unilateral termination of the Provider Agreement—an asset that is property of the Plaintiffs' bankruptcy estate—after the Petition Date violated the automatic stay provisions of 11 U.S.C. § 362(a)(1) and (a)(3). Second, CMS's termination notice purported to impose civil monetary penalties on Magnolia Ridge, and CMS stated that it will withhold the amount of civil monetary penalties from Magnolia Ridge's reimbursement amounts, directly violating the auto-matic stay provision of the Bankruptcy Code and attempting to place itself ahead of the estates' other creditors.

5.      CMS's selection of termination—rather than finding substantial compliance—is also unlawful on its own terms. In response to CMS's reports of deficiencies, Plaintiffs drafted and implemented removal plans to abate the purported immediate jeopardy citations and a comprehen-sive plan of correction, which included implementing several leadership changes, increasing staff and support at Magnolia Ridge, completing audits and reviews of residents' clinical records to ensure implementation of the plan of correction, and engaging full-time outside consultants to oversee the facility's progress. Ms. Suzanne Koenig, one of the independent patient care ombuds-men appointed in these chapter 11 cases (the "PCO") visited Magnolia Ridge on September 3,

interviewed both staff and residents, and concluded, among other things, that the facility "provides quality and safe care to its residents, is an asset to the communities it serves, and does not pose imminent danger to the current residents it serves." Special Report of Suzanne Koenig (Special Report) ¶ 8, Dkt. No. 910.

6.      Termination of Magnolia Ridge's Provider Agreement and ensuing closure of Magnolia Ridge stands to cause substantial and irreparable harm to Plaintiffs, their creditors, and residents of Magnolia Ridge . Terminating the Provider Agreement may cause a cascade of defaults—most notably, a breach of the facility's master lease agreement and the DIP Credit Agreement—eliminate critical Medicare and Medicaid funding that Plaintiffs will no longer receive after October 15, 2025, disrupt and impede Plaintiffs' Debtor's ongoing sale efforts.

7.      Allowing termination rather than a finding of substantial compliance to resume full operations will also jeopardize the health, safety, and well-being of the residents of Magnolia Ridge. Plaintiffs will need to close the facility and transfer all remaining residents from their homes and place them in new facilities (which may not be available in the vicinity or provide the same or better level of care), a traumatic event that poses significant risk to resident safety. Many residents who transferred to other facilities have since expressed their desire to return to Magnolia Ridge if it were able to remain open.

8.      Terminating the Provider Agreement—and forcing residents to leave the facility where they are currently receiving quality, safe care—is not in the best interest of the residents, Plaintiffs, or the surrounding community. This Court should accordingly enter injunctive relief to prevent these irreparable harms and grant other relief necessary to rectify Defendants' unlawful attempted termination of the Provider Agreement.

## PARTIES

9.     Plaintiffs are Genesis and certain of its affiliates and subsidiaries, as Plaintiffs and Debtors-in-possession in the above-captioned chapter 11 cases. Plaintiff Sunbridge Gardendale Health Center, LLC currently operates Magnolia Ridge as a debtor-in-possession.

10.    Defendant Robert F. Kennedy, Jr., is the Secretary of Health and Human Services (the "Secretary") and is the official charged by law with administering the Medicare and Medicaid programs. He is sued in his official capacity only.

11.    Defendant United States Department of Health and Human Services ("HHS") is a cabinet-level executive department charged with enhancing the health and well-being of all Americans.

12.    Defendant Dr. Mehmet Oz is the Administrator of CMS. He administers the Medicare and Medicaid programs on behalf of the Secretary and oversees CMS's activities. He is sued in his official capacity only.

13.    Defendant CMS is the federal agency within HHS tasked with administering the Medicare and Medicaid programs.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984, entered by the United States District Court for the Northern District of Texas.

15.    This is a core proceeding under 28 U.S.C. § 157(b).

16.    Venue is proper under 28 U.S.C. § 1409.

17.    Plaintiffs consent to entry by the Court of a final judgment in this proceeding.

## ALLEGATIONS

### A.    Legal Background

18.    To receive payment under the Medicare and Medicaid programs, a skilled nursing facility must comply with applicable statutory and regulatory requirements under the Medicare Act (42 U.S.C. § 1395i-3), which governs "[r]equirements for, and assuring quality of care in, skilled nursing facilities."

19.    CMS generally relies on state agencies to conduct "surveys" to certify the compliance of skilled nursing facilities (SNFs) with various requirements stated in 42 U.S.C. § 1395i-3(b), (c), and (d). 42 U.S.C. § 1395i-3(g)(1)(A). These include "[r]equirements relating to the provision of services," "relating to residents' rights," and "relating to administration and other matters," respectively.

20.    SNFs are subject to a "standard survey," which is supposed to occur not later than 15 months after the last one, during which "a multidisciplinary team of professionals (including a registered nurse)" evaluate the facility. *See* 42 U.S.C. § 1395i-3(g)(2). If the SNF "is found, under a standard survey, to have provided substandard quality of care," it is then "subject to an extended survey." *Id.* § 1395i-3(g)(2)(B)(i).

21.    State agencies make various recommendations to CMS based on their survey findings. If the State finds in a survey that a SNF "no longer meets a requirement" pertaining to provision of services (subsection (b)), residents' rights (subsection (c)), or administration and other matters (subsection (d)), "and further finds that the facility's deficiencies … immediately jeopardize the health or safety of its residents," then the State shall recommend that the Secretary take certain enforcement actions. 42 U.S.C. § 1395i-3(h)(1)(A).

22.    The Secretary must then evaluate whether to take the actions described in Section 1395i-3(h)(2)(A)(i). If the Secretary finds a violation of subsections (b), (c), or (d) and "further

6

finds that the facility's deficiencies … immediately jeopardize the health or safety of [the SNF's] residents," he must then "take immediate action to remove the jeopardy and correct the deficiencies through the [appointment of temporary management], or terminate the facility's participation." 42 U.S.C. § 1395i-3(h)(2)(A)(i). The Secretary may also seek additional remedies, including civil monetary penalties. *Id.*; *see* 42 C.F.R. § 488.406.

23.     If, by contrast, the Secretary finds that the SNF's deficiencies under subsection (b), (c), or (d) "do not immediately jeopardize the health and safety of its residents," he has a range of remedies available under subparagraph (B)—none of which include terminating the facility's participation in Medicare. 42 U.S.C. § 1395i-3(h)(2)(A)(ii), (h)(2)(B). These alternative remedies may remain until CMS finds "substantial compliance" or "terminates the provider agreement." 42 C.F.R. § 488.454(a).

24.     CMS regulations define "immediate jeopardy" as "a situation in which the provider's noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301. And CMS guidance, in turn, defines "likely" as meaning that "the nature and/or extent of the identified noncompliance creates a reasonable expectation that an adverse outcome resulting in serious injury, harm, impairment, or death will occur if not corrected." CMS, *State Operations Manual: Appendix Q—Core Guidelines for Determining Immediate Jeopardy* (Dec. 13, 2024) § III. An "essential" component of an immediate jeopardy finding is the "need for immediate corrective action by the supplier/provider to prevent serious injury, serious harm, serious impairment or death from occurring or recurring." *Id.* § IV.

25.     A facility must submit a plan of correction for cited deficiencies that "describes the actions the facility will take to correct deficiencies and specifies the date by which those

deficiencies will be corrected." 42 C.F.R. § 488.401. For immediate jeopardy citations, a facility

must also submit a written immediate jeopardy plan of removal that documents "the immediate

action(s) [it] will take to address the noncompliance" that resulted in the immediate jeopardy and

includes "a date by which [it] asserts the likelihood for serious harm to any recipient no longer

exists." CMS, *State Operations Manual: Appendix Q—Core Guidelines for Determining Immedi-

ate Jeopardy* § VII. Notably, "[u]nlike a plan of correction, it is not necessary that the removal

plan completely correct all noncompliance associated with the [immediate jeopardy], but rather it

must ensure serious harm will not occur or recur." *Id.*

26.    If the Secretary decides to terminate a SNF's participation, the SNF may challenge

that decision by filing a request for a hearing with an Administrative Law Judge (ALJ) of "the

Departmental Appeals Board in the Office of the Secretary for Health and Human Services" within

60 days of the notice of termination. CMS, *State Operations Manual*, ch. 7, § 7303; 42 C.F.R.

§§ 498.40(a)(2), 498.5. The SNF can then appeal to the Departmental Appeals Board (DAB) and

ultimately to a federal district court. 42 C.F.R. §§ 498.82, 498.90.

27.    Agency appeals of a termination notice can take *years* to resolve. In the meantime,

CMS's initial termination decision is "binding" and remains in effect until it is reconsidered or

reversed. *See* 42 C.F.R. § 498.20(b). Thus, absent relief from this Court, Plaintiffs will need to

undertake the process to close the Magnolia Ridge facility, including by moving residents to other

facilities that will provide them with substantially similar services and "maintain[] a reasonable

quality of care." 11 U.S.C. § 704(a)(12)(C).

**B.    Factual background**

*1.    Plaintiffs' leased facilities*

28.    Genesis operates approximately 175 facilities, which are collectively home to over

15,000 residents.

8

29.    Magnolia Ridge is one such facility. It is a 148-licensed bed skilled nursing facility in Gardendale, Alabama. Some of its core services include post-hospital, short-term rehabilitation and long-term and respite care services. *See* Special Report ¶ 2. Magnolia Ridge is currently rated two stars on Medicare.gov and is rated 5/5 stars on quality measures—significantly higher than the national average.[2]

30.    Sunbridge Gardendale Health Care Center, LLC is the licensed operator of the Magnolia Ridge facility and the legal entity associated with the Magnolia Ridge d/b/a name. Debtor Sunbridge Retirement Care Associates, LLC is the 100% owner of Sunbridge Gardendale Health Care Center, LLC. Magnolia Ridge is one of seven of the Plaintiffs' facilities that are operated on leased premises under that *Amended and Restated Master Lease Agreement* dated November 1, 2016 (as subsequently amended, modified, or restated, the "Master Lease") by among LTC GP I, Inc., LTC-Griffin, Inc., and Albuquerque Real Estate Investments, Inc. (collectively, the "LTC Landlords") and Debtors Sunbridge Gardendale Health Care Center, LLC, Sunbridge Retirement Care Associates, LLC, and Leasehold Resource Group, LLC (collectively, the "Lessees"). The seven facilities are located in Alabama, Georgia, and New Mexico.

31.    The Master Lease states that an Event of Default shall result following "any material suspension, termination, or restriction placed upon Lessee, or the Leased Property, or the ability to admit residents or patients (*e.g.*, an admissions ban or non- payment for new admissions by Medicare or Medicaid), and such suspension, termination, or restriction continues for more than sixty (60) calendar days after imposition thereof[.]" Master Lease, Art. 16.1(n).

---

[2]    *See Magnolia Ridge*, Medicare.gov [tinyurl.com/9y26xctc] (last visited Sept. 24, 2025) (showing better performance than the national and Alabama average on measures of patient quality measures for both short-stay and long-stay patients).

### *2.  The ADPH surveys*

32.    After a nearly six-year hiatus from annual surveys of Magnolia Ridge, the Alabama Department of Public Health, Division of Health Care Facilities ("ADPH") (commonly called the State Survey Agency or "SSA") conducted three surveys of Magnolia Ridge from March 2025 to August 2025 to assess the facility's compliance with the statutory and regulatory requirements for participation in Medicare and Medicaid. As shown below, over the course of these surveys, ADPH tagged Magnolia Ridge with multiple purported immediate jeopardy citations stemming principally from only three incidents. Magnolia Ridge drafted removal plans for each immediate jeopardy citation, which ADPH initially accepted, until it stopped accepting them following the third survey. Magnolia Ridge is now left with seven unabated immediate jeopardy citations, all for an incident that occurred months ago, when Magnolia Ridge was a very different facility.

| Date of Incident | Description | Tags & Date of Tags | Abatements |
|---|---|---|---|
| February 1, 2025 | A resident went across the street from the facility unattended. | March 13, 2025: 689 | Abatement plan accepted on March 15, 2025. |
| April 1, 2025 | A resident struck another resident with a closed fist. | May 13, 2025: 600, 609, 645, 740, 760, 835<br><br>May 15, 2025: 610, 867<br><br>May 28, 2025 (reissued): 600, 609, 610, 740, 760, 835, 867 | Abatement plan accepted on June 4, 2025. |
| May 16, 2025 | A resident went to a nearby CVS pharmacy unattended after a dentist appointment to get a card for his mother. | August 22, 2025: 600, 609, 610, 689, 835, 837, 867 | Abatement plans submitted to ADPH three times—on August 22, 2025, August 28, 2025, and September 1, 2025—but not accepted by ADPH. |

10

33.    **The initial survey:** From March 2, 2025, to March 19, 2025, ADPH conducted its initial annual survey of Magnolia Ridge. ADPH had not conducted an annual survey of Magnolia Ridge since 2019. It conducted only infection control and complaint-based surveys in 2020, 2021, and 2022 and did not conduct any survey of the facility in 2023 or 2024. Thus, during the March 2025 survey, ADPH reviewed all reportable events dating back to the last survey in 2019.

34.    As a result of the March 2, 2025 survey, surveyors issued citations to Magnolia Ridge, including four immediate jeopardy citations. Of those, three were related to the same July 2023 incident and were not ongoing but instead were citations for past non-compliance. The fourth citation related to an incident that occurred on February 1, 2025, during which a resident exited through the facility's secured back doors before the receptionist's shift began; a facility staff member found the resident across the street from the facility in a wheelchair. That resident had a Brief Interview for Mental Status ("BIMS") score of 14 out of 15, indicating high cognitive functioning, and did not suffer any harm during the incident. Yet ADPH tagged an immediate jeopardy for this incident during its survey on March 13, 2025. In response, Plaintiffs immediately implemented abatement measures, and the very next day, surveyors verified onsite that corrective measures had been implemented. ADPH removed the immediate jeopardy finding on March 15, 2025, at which time Magnolia Ridge had no active immediate jeopardy citations.

35.    On April 9, 2025, Magnolia Ridge received the CMS Form 2567 documenting other non-immediate jeopardy deficiencies. In the cover letter to the Form 2567, ADPH imposed a discretionary denial of payment for new admissions effective April 22, 2025, and threatened that CMS would terminate Magnolia Ridge's participation in Medicare if it remained out of substantial compliance six months after the survey date of March 19, 2025.

36.     Magnolia Ridge promptly submitted a plan of correction to ADPH on April 17, 2025, in which it alleged that it was substantially compliant as of that date. ADPH accepted that plan.

37.     **The first revisit survey:** Surveyors returned to Magnolia Ridge just a few weeks later on May 6, 2025, for the first revisit survey, and they spent an entire month (through June 5, 2025) conducting the survey.

38.     Magnolia Ridge received six immediate jeopardy citations on May 13, 2025, related to a single April 1, 2025 incident. This incident, however, had occurred before April 17, 2025, the date on which Magnolia Ridge alleged it was in substantial compliance after remediating the deficiencies cited in the first survey—an allegation of substantial compliance that ADPH had accepted. These citations for the April 1, 2025 incident were highly unusual because revisit surveys do not typically investigate immediate jeopardy citations for incidents that occurred before the most recent date of compliance; instead, surveyors typically focus more on any current risks to resident health and safety rather than past non-compliance.

39.     The April 1, 2025 incident concerned a resident striking another with a closed fist. Magnolia Ridge placed the resident on a safety code and evaluated him by a psychologist, and the two residents were separated. The two residents later had a verbal confrontation on May 8, 2025, prompting another immediate jeopardy citation. Magnolia Ridge drafted removal plans for these immediate jeopardy citations, but ADPH refused to accept the removal plans. ADPH's rejection stemmed not from the substance of the plans but because the written submission failed to include a percentage breakdown of staff that had been re-educated under the plan and because of other formatting and wording issues. Rather than give Magnolia Ridge a chance to abate the immediate

jeopardies, ADPH issued two more immediate jeopardy citations for the same April 1 incident on May 15, 2025.

40.    Magnolia Ridge hired a new Licensed Nursing Home Administrator and Director of Nursing on May 24, 2025, to further improve its services. Yet the ADPH surveyors—who had by then been onsite for more than three weeks—issued five more immediate jeopardy citations on May 28, 2025, relating to the administration of medication and healthcare-status notification for an individual resident. Magnolia Ridge drafted plans of removal, which ADPH once again refused to accept. Instead, ADPH issued three *more* immediate jeopardy citations for the same incident involving the individual resident.

41.    After repeated rejections of Magnolia Ridge's removal plans, ADPH finally accepted the removal of all immediate jeopardies on June 4, 2025. And on June 25, 2025—twenty days after the re-visit survey ended—Magnolia Ridge received the CMS Form 2567 documenting other deficiencies that did not rise to the level of immediate jeopardy. On July 5, 2025, Magnolia Ridge submitted a plan of correction to ADPH with an alleged date of compliance of July 9, 2025. After several initial rejections, ADPH finally accepted it on July 24, 2025.

42.    **The second revisit:** ADPH returned once again for a second revisit from August 17 to August 23, 2025, this time with a team of about twelve surveyors. ADPH issued another seven immediate jeopardy citations on August 22, 2025, all relating to the same incident that occurred on May 16, 2025—before Magnolia Ridge's change in leadership, and prior to ADPH's acceptance of Magnolia Ridge's subsequent alleged date of compliance.

43.    That day, Magnolia Ridge transported a resident with a BIMS score of 15 out of 15 to a dentist appointment. The facility's process at the time would determine the level of supervision a resident needed based on BIMS score—the higher the score, the higher the person's cognitive

function. This resident would normally call the facility after the appointment was over to be picked up. Instead of waiting at the dentist, the resident walked to a CVS Pharmacy across the street to get a card for his mother. The resident previously lived in the area and was therefore familiar with his surroundings. The resident was returned safely to the facility and not assessed for wandering after the incident; indeed, family members confirmed that the resident was not a wanderer and had never tried to leave the facility.

44.    Surveyors, however, issued seven immediate jeopardy citations based on this incident. But the surveyors did not even interview the resident before doing so. The PCO did interview the resident, and "the resident confirmed that they were not harmed." Special Report ¶ 11. Magnolia Ridge submitted removal plans for these immediate jeopardy citations on three separate occasions—August 22, August 28, and September 1, 2025—and separately attempted to hand-deliver removal plans to onsite surveyors who refused to accept them. To date, ADPH has still not accepted these plans of removal.

45.    Magnolia Ridge received the CMS Forms 2567, documenting the seven immediate jeopardy deficiencies and other deficiencies on September 3, 2025. On September 13, 2025, Magnolia Ridge submitted to ADPH a plan of correction with an alleged date of compliance of September 12, 2025. This plan of correction has not been accepted to date.

46.    In the facility's plans of removal, in addition to underscoring the systemic changes the facility made to remedy and prevent deficiencies, Magnolia Ridge described the specific measures it took with respect to the May 16, 2025 incident. The facility conducted an audit of all individuals who left the facility within the past thirty days to determine whether an escort was present. And Magnolia Ridge changed its policy to require that all residents be accompanied on medical appointments by staff, a transportation company, or family, regardless of the resident's

BIMS score. To implement this, Magnolia Ridge revised the Patient Transport agreement for non-emergency medical transportation to include an escort who accompanies the resident from the facility to the scheduled appointment.

### 3.     *Magnolia Ridge today*

47.     In response to ADPH's cited deficiencies, Plaintiffs have made several changes to the operations and leadership of the facility. In May 2025, Magnolia Ridge implemented a leadership overhaul, replacing the Licensed Nursing Home Administrator (the "Administrator" or "NHA") and Director of Nursing and Medical Director ("DON"). The new Administrator, Sharon Warren, has been on site at the facility since May 24, 2025. Ms. Warren has nearly 30 years of experience as a facility administrator, received extensive education on the facility's anti-abuse policy and reporting requirements upon starting in her new role, and had been the interim Administrator at Magnolia Ridge previously. Magnolia Ridge also hired a new Medical Director in August 2025.

48.     In addition, the facility's governing body—responsible for establishing and implementing policies regarding the management and operation of the facility—was reconstituted to add Genesis Chief Operating Officer and Associate Chief Clinical Officer. Genesis corporate leadership has been onsite regularly to support and oversee implementation of the plan of correction. On August 4, 2025, Magnolia Ridge added a full-time Quality Manager ("QM"), who reports to the governing body, and who analyzes quality data, identifies trends, determines root causes, and pinpoints causal factors for improvement. Also on August 4, 2025, Magnolia Ridge entered into a contract with independent consulting firm RB Health Partners—which the facility had engaged part-time since May 2025—to be onsite at the facility daily for the next six months to assist with education and monitoring. The consultants work to ensure that the facility and its staff properly identify, report, and investigate incidents of abuse or neglect. The consultants also provide weekly

education on risk topics to the facility's Quality Assurance Performance Improvement Committee
("QAPI Committee"). The QAPI Committee, which includes a member of the governing body,
meets at least weekly to review incidents and conduct root cause analyses where needed.

49.     In addition, the neutral, third-party PCO has visited the facility personally, inter-
viewed staff and residents, and reviewed medical records, audits, and plans of correction. The
PCO's representatives and staff continue to monitor the facility in person and can confirm that the
facility has adequate staffing and supplies. The PCO is satisfied with the care provided at the fa-
cility currently. *See* Special Report ¶¶ 8-12.

50.     The Administrator has further implemented audits, including staff interviews, to
ensure compliance with Magnolia Ridge's anti-abuse policy. Audits will be conducted at least five
times a week for four weeks, then four times a week for four additional weeks, and then three times
a week for two weeks. The QAPI Committee will then receive results of these audits and will make
further audit recommendations based on outcomes.

###     C.      Procedural background

51.     Beginning on July 9, 2025 (the "Petition Date"), each debtor (collectively, the
"Debtors") commenced a case by filing a petition for relief under Chapter 11 of the Bankruptcy
Code in this Court (collectively, the "Chapter 11 Cases"). The Debtors, including the Plaintiffs,
continue to operate their businesses and manage their properties as Plaintiffs and Debtors-in-pos-
session. *See* 11 U.S.C. §§ 1107(a), 1108. On July 30, 2025, the Office of the United States Trustee
for Region 6 (the "U.S. Trustee") appointed an official committee of unsecured creditors (the
"Committee") in the Chapter 11 Cases. *See* Dkt, Nos. 250, 262, 699. To date, no trustee or exam-
iner has been appointed.[3]

---

[3]     Additional information regarding Debtors and these Chapter 11 Cases, including the Debtors' business operations,
capital structure, financial condition, and the reasons for and objectives of these Chapter 11 cases, is set forth in the

52.     On August 28, 2025, the Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Dkt. No. 677] (the "Final DIP Order"), which included a copy of the DIP Credit Agreement. Section 6.2(b) of the DIP Credit Agreement provides that the Debtors shall "maintain in full force and effect all Permits and Primary Licenses for the Healthcare Facilities, and a provider agreement or participation agreement for each Third-Party Payor Program[.]" DIP Credit Agreement § 6.2(b).

53.     Under the DIP Credit Agreement, an Event of Default will occur if "default shall be made in the due observance or performance by any Loan Party of any covenant, condition, or agreement contained in any Loan Document" and "such default shall continue unremedied for a period of 30 days after the earlier of (i) the date on which a Responsible Officer of any Loan Party becomes aware of such failure and (ii) the date on which notice thereof shall have been given to Borrower from the Administrative Agent or the Required Lenders[.]" DIP Credit Agreement § 8(d).

54.     On September 4, 2025, despite Magnolia Ridge's corrective measures and cooperation with the state agency, CMS provided the facility with a notice of involuntary termination. Decl. of Russell A. Perry, Ex. A, Notice of Involuntary Termination (the "Termination Notice") at 1, Dkt. No. 923. The Termination Notice stated that "[i]mmediate jeopardy was determined to exist on May 16, 2025, and remains ongoing" and that "[b]ased on the August 23, 2025, survey findings, CMS [w]as imposing" several "discretionary enforcement remedies." *Id.* at 1-2.

---

*Declaration of Louis E. Robichaux IV in Support of Chapter 11 Petitions and First Day Pleadings* [Dkt. No. 18] (the First Day Declaration).

a.    First, Magnolia Ridge's "Medicare provider agreement w[ould] be terminated at 11:59 P.M. on September 15, 2025," with the facility receiving only 30 more days of Medicare and Medicaid payments to "facilitate the orderly transfer/relocation of residents" admitted on or before April 22, 2025. Termination Notice at 2.

b.    Second, CMS's denial of payment for new admissions "effective April 22, 2025" would "continue until [Magnolia Ridge's] Medicare provider agreement [wa]s terminated on September 15, 2025." Termination Notice at 2.

c.    Third, a per day civil money penalty would be imposed "in the amount of $8,140.00 beginning August 15, 2025, and continuing through September 15, 2025." Termination Notice at 3. CMS has threatened to immediately collect those penalties and place them in an escrow account. Termination Notice at 2.

d.    Finally, the notice requires Magnolia Ridge to "provide the State Survey Agency with the name and address of the attending physician for each resident found to have received" substandard quality of care and that the facility may face loss of its nurse aide training program. Termination Notice at 4.

55.    After receiving the Termination Notice, Plaintiffs provided APDH and CMS with additional documentation reflecting various abatements of the purported deficiencies and a proposed closure plan. Nonetheless, CMS did not modify its decision to terminate Magnolia Ridge's Medicare Provider Agreement. Plaintiffs were thus forced to begin the closure process of the Magnolia Ridge facility. Beginning September 12, 2025, Magnolia Ridge began transferring residents

out of their homes at Magnolia Ridge to other skilled nursing facilities. According to the CMS Nursing Home Compare tool, the closest nursing facility to Gardendale, Alabama—still over three miles away—is a one-star facility, and the next closest facility is over seven miles away.[4] There are only eight facilities within ten miles of Magnolia Ridge—three rated one star, three rated two stars, and two rated three stars.[5]

56.    Plaintiffs promptly requested an emergency hearing before the Court regarding the imminent termination of Magnolia Ridge's Medicare Provider Agreement. The PCO provided a Special Report and testified during the September 15 hearing that, based on her observations of Magnolia Ridge and interviews with capable and competent staffing residents (including the resident that was the subject of the May 16, 2025 immediate jeopardy citation), doctors, nurse practitioners, and families over the last 30 days, she "did not know" why the facility's Provider Agreement was being terminated and that, to her, "the facility was running fine." Hr'g Tr. 16:59-17:35, *In re Genesis Healthcare, Inc.*, Case No. 25-80185 (SGJ) (Bankr. N.D. Tex. Sept. 15, 2025). The PCO further testified that she had "been in many facilities" and may have seen imminent danger "somewhere else," but "[i]t just fe[lt] like [Magnolia Ridge] [wa]s not in imminent danger." *Id.* As this Court recognized, transferring patients, many of whom are in "a vulnerable state," from their homes is "hugely disruptive and can be harmful to patient care" (*id.* at 05:44) and "that's why Congress put [Section 704(a)(12)] in the Bankruptcy Code. That's why Congress created the role of the patient care ombudsman" (*id.* at 36:12).

57.    Later that day, Plaintiffs filed an emergency motion for the entry of an order temporarily enjoining the termination of Magnolia Ridge's Provider Agreement through and including

---

4    Nursing Home Compare, Medicare.gov [https://tinyurl.com/4k7w8mz4] (last visited Sept. 25, 2025).

5    *Id.*

September 30, 2025. *See* Dkt. No. 922. With the looming Provider Agreement termination set to take effect at 11:59 P.M. that night, Plaintiffs sought relief through a motion, rather than an adversary complaint The Court granted Plaintiffs' motion that same day. *See* Dkt. No. 924.

58.    In the days since this Court granted Plaintiffs temporary relief, Plaintiffs have continued to engage with CMS to try to find a mutually agreeable resolution and path forward. But CMS would not agree to any alternative that would not involve a near-term termination of the Provider Agreement and closure of the facility. Plaintiffs have thus contested CMS's determination through available agency channels, and on Monday, September 29 requested a hearing with expedited review. Due to the lengthy nature of CMS's internal appeals process, however, Plaintiffs and the residents of Magnolia Ridge will be irreparably harmed in the interim absent further relief from this Court.

## PLAINTIFFS ARE ENTITLED TO RELIEF

### A.    CMS violated the automatic stay under 11 U.S.C. § 362.

59.    As set forth above, Plaintiffs filed voluntary petitions for relief under title 11 of the United States Code (the "Bankruptcy Code") in this Court on the Petition Date. "The filing of a bankruptcy petition creates an estate that is comprised of, among other things, 'all legal or equitable interests of the debtor in property as of the commencement of the case.'" *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 584 (5th Cir. 2008) (quoting 11 U.S.C. § 541(a)(1)). "[T]he scope of property rights and interests included in a bankruptcy estate is very broad: The conditional, future, speculative, or equitable nature of an interest does not prevent it from being property of the bankruptcy estate." *In re Burgess*, 392 F.3d 782, 785 (5th Cir. 2004) (citation omitted), *rev'd en banc on other grounds*, 438 F.3d 493 (5th Cir. 2006); *accord In re Majestic Star Casino, LLC*, 716 F.3d 736, 750-751 (3rd Cir. 2013) (noting it is "well established that the mere opportunity to

receive an economic benefit in the future is property with value under the Bankruptcy Code")
(citing *Segal v. Rochelle*, 382 U.S. 375, 379 (1966)).

60.    When a bankruptcy petition is filed, the automatic stay provided by Bankruptcy
Code Section 362 "operates as a self-executing injunction. The stay prevents creditors from taking
any collection actions against the debtor or the property of the debtor's estate for pre-petition
debts." *Campbell v. Countrywide Home Loans, Inc*., 545 F.3d 348, 354-355 (5th Cir. 2008).

61.    "[T]he automatic stay of § 362 of the Bankruptcy Code is 'one of the fundamental
debtor protections provided by the bankruptcy laws.'" *In re Elcoteq, Inc.*, 521 B.R. 189, 198
(Bankr. N.D. Tex. 2014) (quoting *Midlantic Nat'l Bank v. N.J. Dep't of Env't. Prot*., 474 U.S. 494,
503 (1986)). The automatic stay prohibits, among other things, "the commencement or continua-
tion … of a judicial, administrative, or other action or proceeding against the debtor that was or
could have been commenced before the commencement of the [bankruptcy] case … , or to recover
a claim against the debtor that arose before the commencement of the case." *St. Paul Fire & Ma-
rine Ins. Co. v. Labuzan*, 579 F.3d 533, 538 (5th Cir. 2009) (quoting 11 U.S.C. § 362(a)). "The
automatic stay is 'designed to effect an immediate freeze of the status quo by precluding and nul-
lifying post-petition actions, judicial or non-judicial, in non-bankruptcy for [or] against the debtor
or affecting the property of the estate." *In re Moss*, 270 B.R. 333, 341-342 (Bankr. W.D.N.Y.
2001) (alteration in original) (emphasis omitted) (quoting *Hillis Motors, Inc. v. Hawaii Auto. Deal-
ers' Ass'n*, 997 F.2d 581, 585 (9th Cir. 1993)).

62.    The Termination Notice violated the Bankruptcy Code's automatic stay provision
twice over: (1) by unilaterally and unjustifiably terminating Magnolia Ridge's Provider Agreement
and (2) by threatening to unlawfully withhold civil monetary penalties from Magnolia Ridge's
outstanding Medicare and/or Medicaid receivables and place those funds in escrow, effectively

placing the government ahead of all other creditors and interfering with Plaintiffs' rights under the

Bankruptcy Code. Importantly, CMS's actions do not fall within the exception to the automatic

stay for government and regulatory enforcement actions (11 U.S.C. § 362(b)(4)) because CMS is

acting out of its own pecuniary interest in terminating payments to the facility. CMS had other

statutory remedies available to it—including the appointment of temporary management "to assure

the health and safety of the facility's residents" (42 U.S.C. § 1395i-3(h)(1)(A), (h)(2)(A)(i),

(h)(2)(B)(iii))—but it elected not to take them, terminating the agreement instead.

### 1. *CMS's termination of Magnolia Ridge's Provider Agreement violates the automatic stay.*

63.    Magnolia Ridge's rights under its existing Provider Agreement and its expected

ability to receive payments from participation in the Medicare program are property of the estate

protected by the automatic stay. *See In re Psychotherapy & Counseling Ctr., Inc.*, 195 B.R. 522,

532 (Bankr. D.C. 1996) ("[T]he debtor's rights under the provider agreements to participate in the

Medicaid and Medicare provider reimbursement program are properly considered property of the

estate. The debtor's rights under the agreement to receive reimbursement payments from govern-

ment in this program clearly have value to the debtor[.]"); *First Am. Health Care of Ga. Inc. v.

Dep't of Health & Hum. Servs.*, 208 B.R. 985, 987 (Bankr. S.D. Ga. 1996) (enjoining any action

by HHS to terminate debtor's provider agreements due to accusations of Medicare fraud as a vio-

lation of 11 U.S.C. § 362).[6]

---

[6]    Although the *First American* opinion was eventually vacated upon the parties' reaching a settlement that main-
tained the status quo (*see First Am. Health Care of Ga., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 1996 WL 282149
(Bankr. S.D. Ga. Mar. 11, 1996)), courts have found its analysis persuasive (*see In re Bayou Shores*, 525 B.R. 166,
166 n.44 (Bankr. M.D. Fla. 2014)).

64.    The Termination Notice was sent after the Petition Date, based on findings and events that, according to CMS, existed prior to that date. *See* Termination Notice at 1 (asserting that "immediate jeopardy was determined to exist on May 16, 2025").

65.    CMS's termination of the Provider Agreement after the Petition Date is therefore "the commencement… of a judicial [or] administrative … action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title" (11 U.S.C. § 362(a)(1)) and "an act to … exercise control over property of the estate" (*id.* § 362(a)(3)). The termination thus violated the automatic stay provided by Bankruptcy code Section 362(a)(1) and (a)(3).

### 2. *CMS's imposition and collection of civil monetary penalties violates the automatic stay.*

66.    CMS's termination notice imposes civil monetary penalties ("<u>CMPs</u>") of $8,140 per day beginning August 15, 2025, and continuing through September 15, 2025. Termination Notice at 3.

67.    The Notice further states that CMS has "decided to collect [the] facility's CMP and place it in an escrow account." Termination Notice at 3. In other words, CMS has threatened to withhold the amount of civil monetary penalties from amounts otherwise due to Magnolia Ridge as reimbursement for services and care provided to residents.

68.    Collecting CMPs by withholding them from Magnolia Ridge's reimbursement amounts would violate the automatic stay.

69.    Courts have routinely held that the automatic stay in Bankruptcy Code Section 362 "applies to actions by creditors to set off post-petition obligations against pre-petition claims," including the government when it acts as a creditor. *Univ. Med. Ctr. v. Sullivan*, 122 B.R. 919, 925 (E.D. Pa. 1990), *clarified on denial of reconsideration*, 125 B.R. 121 (E.D. Pa. 1991), *aff'd sub*

*nom. In re Univ. Med. Ctr.*, 973 F.2d 1065 (3d Cir. 1992). In *University Medical Center*, for ex-

ample, the bankruptcy court concluded that "the Secretary's decision to set off pre-petition over-

payment against its obligation to provide reimbursement for post-petition Medicare services" vio-

lated the automatic stay because the bankruptcy code "does not allow set-off where the creditor's

debt to the debtor arises after the debtor filed for bankruptcy." 122 B.R. at 925 (citing *Lee v.

Schweiker*, 739 F.2d 870, 875 (3d Cir. 1984)).

70.     Further, "[i]t is undisputed that [the government] may not bypass the automatic stay

to enforce a monetary judgment." *California ex rel. Brown v. Villalobos*, 453 B.R. 404, 414 (D.

Nev. 2011). Although the automatic stay does not prevent the government from "fixing" the

amount of a monetary penalty, that applies when "the government [seeks] *only* the entry of a judg-

ment and not any sort of enforcement of that judgment against the debtor." *In re Psychotherapy &

Counseling Ctr., Inc.*, 195 B.R. at 528 (emphasis added).

71.     It is therefore unlawful for CMS to unilaterally collect CMPs by deducting such

amounts from Magnolia Ridge's outstanding reimbursements, which places CMS ahead of other

creditors, in violation of the automatic stay in Bankruptcy Code Section 362.

### 3.      CMS's actions do not fall within the government regulatory exception under 11 U.S.C. § 362(b)(4).

72.     CMS's actions do not fall within Bankruptcy Code Section 362(b)(4)'s government

regulatory exception because CMS is primarily acting in its own pecuniary interest, not in the

interest of the health and safety of Magnolia Ridge's residents. The effect of the termination of the

Provider Agreement is not that the facility must necessarily close, but that the facility can no longer

receive payment for services rendered to Medicare and Medicaid residents. CMS apparently has

no qualms with allowing residents to remain at Magnolia Ridge even past October 15, 2025, so

long as CMS does not have to pay for their care.

73.     To determine whether proceedings fall within the police or regulatory power exception to the automatic stay, "courts have applied two related, and somewhat overlapping tests: the pecuniary purpose test and the public policy test." *In re Halo Wireless, Inc.*, 684 F.3d 581, 588 (5th Cir. 2012) (quotation marks and citation omitted). "The pecuniary purpose test asks whether the government primarily seeks to protect a pecuniary governmental interest in the debtor's property, as opposed to protecting the public safety and health. The public policy test asks whether the government is effectuating public policy rather than adjudicating private rights." *Id.* (quotation marks and citations omitted). Together, these tests "contemplate that the bankruptcy court, after assessing the totality of the circumstances, [will] determine whether the particular regulatory proceeding at issue is designed primarily to protect the public safety and welfare, or represents a governmental attempt to recover from property of the debtor estate, whether on its own claim, or on the nongovernmental debts of private parties." *In re McMullen*, 386 F.3d 320, 325 (1st Cir. 2004) (emphasis omitted). Given the expansiveness and importance of the automatic stay provision in Bankruptcy Code Section 362, "the exception contained in subsection 362(b)(4) is to be narrowly construed." *Id.*

74.     Here, CMS is not acting in furtherance of health and safety but in service and in furtherance of its own pecuniary interest.

75.     Congress "intended the section 362(b)(4) exception to apply exclusively to actions enforcing *generally applicable regulatory laws* governing the behavior of debtors." *In re Corporacion de Servicios Medicos Hospitalarios de Fajardo*, 805 F.2d 440, 445 (1st Cir. 1986) (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 343 (1977)). But "[n]owhere is it mentioned that section 362(b)(4) permits government agencies to enforce contractual rights against debtors without first seeking relief from the automatic stay." *Id.* (emphasis omitted). Here, however, CMS is trying only

to avoid its own obligations to reimburse Plaintiffs for caring for their residents, not to ensure regulatory compliance.

76.    Furthermore, ADPH is responsible for conducting the surveys of the facility at issue and has the authority to decertify the facility but has not taken any steps to do so. So too with CMS—upon a finding of immediate jeopardy, the Secretary has the option to "take immediate action to remove the jeopardy and correct the deficiencies" through the appointment of temporary management "to assure the health and safety of the facility's residents." 42 U.S.C. § 1395i-3(h)(1)(A), (h)(2)(A)(i), (h)(2)(B)(iii). But CMS did not do so. As in *Corporacion*, when the government has other "means and opportunity" to enforce its health and safety regulations "but instead chose[s] to pursue a contractual remedy," the government-regulatory exception in Section 362(b)(4) does not apply. 805 F.2d at 446; *see also In re Berkelhammer*, 279 B.R. 660, 666 (Bankr. S.D.N.Y. 2002). ("NYSDH's unilateral action to call a default under the Reinstatement Agreement did not fall within the police and regulatory exception to the automatic stay under section 362(b)(4) of the Bankruptcy Code."); *In re King Mem'l Hosp., Inc.*, 4 B.R. 704, 705, 709 (Bankr. S.D. Fla. 1980) (automatic stay applied to the State of Florida's entering an order declaring that the debtor hospital had forfeited its exemption from a Certificate of Need for the construction of a 126-bed general hospital).

77.    CMS also cannot collect CMPs under any circumstance without violating the automatic stay. Although Bankruptcy Code Section 362(b)(4) "except[s] from the automatic stay certain judgments obtained in actions to enforce police or regulatory powers, § 362(b)(5) creates an 'exception to the exception,' [from the automatic stay] in that actions to enforce money judgments are affected by the automatic stay, even if they otherwise were in furtherance of police and regulatory powers." *In re Commonwealth Oil Ref. Co., Inc.,* 805 F.2d 1175, 1183 (5th Cir. 1986)

(alteration in original) (emphasis omitted) (quotation marks and citation omitted). As the Fifth

Circuit explained, because "the assets of the debtor are in the possession and control of the bank-

ruptcy court, and since they constitute a fund out of which all creditors are entitled to share, en-

forcement by a governmental unit of a money judgment would give it preferential treatment to the

detriment of all other creditors." *Id.* at 1183 (quotation marks and citation omitted). "[*A*]*t most*, a

money judgment may be entered," but the government-regulatory exception "does not allow en-

forcement of a money judgment against the debtor." *In re Halo Wireless, Inc.*, 684 F.3d at 587

(emphasis added); *see also id.* ("[A]nything beyond the mere entry of a money judgment against

a debtor is prohibited by the automatic stay." (emphases omitted) (citation omitted)); *In re Kemp*,

52 F.3d 546, 552 (5th Cir. 1995) ("ACS's unilateral action in withholding the $50,000 for its own

assurance pending the outcome of the Atkinson lawsuit did not affect the status of those funds as

Kemp's pre-petition earned income; neither did that action by ACS magically transmogrify

Kemp's ownership interest in his earnings into a contingency.").

78.     Thus, while the exception in Bankruptcy Code Section 362(b)(4) can allow the gov-

ernment to take certain actions in furtherance of its police or regulatory powers, "actual enforce-

ment" of a money judgment "is not permitted." *See In re Halo Wireless, Inc.*, 684 F.3d at 587 n.5

(citation omitted); *see also, e.g.*, *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 209, 212

(1983) (recognizing that the IRS is bound by the provisions of the Bankruptcy Code "to the same

extent as any other secured creditor" and must "seek protection of its interest according to the

congressionally established bankruptcy procedures, rather than by withholding the seized property

from the debtor's efforts to reorganize"). .

**B.    CMS's attempted termination of Magnolia Ridge's Provider Agreement was unlawful.**

79.    As noted above, CMS is statutorily authorized to terminate Magnolia Ridge's Provider Agreement only upon a finding that the "facility's deficiencies … *immediately* jeopardize the health or safety of [the SNF's] residents." 42 U.S.C. § 1395i-3(h)(2)(A)(i) (emphasis added).

80.    CMS's termination of the Provider Agreement stemmed from the purported immediate jeopardy designation based on the May 16, 2025 dentist's office elopement. *See* Termination Notice at 1 (stating that "[i]mmediate jeopardy was determined to exist on May 16, 2025, and remains ongoing").

81.    CMS's finding of immediate jeopardy based on this incident is not supported by substantial evidence. Per CMS's own regulations, immediate jeopardy requires a finding that the facility's noncompliance "has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301. Available evidence establishes beyond debate that the resident involved in the May 16, 2025 incident was not harmed at all and was not placed in immediate jeopardy of further risk.

82.    Further, after the incident, Magnolia Ridge revised the Patient Transport Agreement for non-emergency medical transportation to include an escort who will accompany residents from the facility to their scheduled appointments. Magnolia Ridge presented this plan of correction to ADPH surveyors when they were on-site during the August revisit survey, but the surveyors refused to accept it. Since May 16, 2025, Magnolia Ridge has not had another issue with elopement of any resident, confirming the abatement measures the facility implemented were successful and that any immediate jeopardy was quickly resolved. CMS cannot support the finding that any immediate jeopardy, if it existed at all, "remain[ed] ongoing" through the date of the termination letter, September 4, 2025.

83.    Thus, Magnolia Ridge's substantial compliance compels the conclusion that CMS's termination of the Provider agreement was unlawful and that CMS is required to lift the new patient admissions ban that CMS instituted in April 2025. *See* 42 C.F.R. § 488.454(a) (directing "alternative remedies" until the "facility has achieved substantial compliance" or the government "terminates the provider agreement").

**C.    The Court has jurisdiction over this Complaint.**

84.    This Court has jurisdiction over this Complaint because it is a core proceeding under the Bankruptcy Code that seeks to enforce the automatic stay pursuant to Bankruptcy Code Section 362 and Debtors' rights under 11 U.S.C. §§ 363 and 365. *See* 11 U.S.C. § 157; *In re Wood*, 825 F.2d 90, 96-97 (5th Cir. 1987).

85.    This Court has jurisdiction over this complaint even if this is a non-core proceeding, as it "relates to" an existing bankruptcy case. *See In re With Purpose, Inc.*, 654 B.R. 715, 726 (Bankr. N.D. Tex. 2023); *In re GenOn Mid-Atlantic Development, L.L.C.*, 42 F.4th 523, 534 (5th Cir. 2022). In any event, Plaintiffs consent to entry by the Court of a final judgment in this proceeding. *See* 28 U.S.C. § 157(c)(2); Fed. R. Bankr. P. 7008.

86.    Section 405 of the Medicare Act does not present any obstacle to this Court's jurisdiction. Although Section 405(h), incorporated into the Medicare Act via 42 U.S.C. § 1395ii, typically divests district courts of jurisdiction to hear claims arising under the Medicare Act and limits judicial review only to the process prescribed in section 405(g)—by seeking review "after any final decision" of the Secretary—this Court has jurisdiction to adjudicate all of Plaintiffs' claims and to enter the requested relief.

87.    Plaintiffs' Bankruptcy Code claims arise under the Bankruptcy Code, not the Medicare Act. Section 405(h)'s jurisdictional bar does not prevent "bankruptcy courts from relying on their general jurisdictional grant found at 28 U.S.C. § 1334(b)." *In re Benjamin*, 932 F.3d 293, 296

(5th Cir. 2019). Instead, the "plain text" of Section 405(h) "only bars actions under 28 U.S.C. §§ 1331 and 1346; it in no way prohibits an assertion of jurisdiction under section 1334." *Id.* at 297 (quoting *In re Town & Country Home Nursing Servs., Inc.*, 963 F.2d 1146, 1155 (9th Cir. 1991)). The Court accordingly has the power to resolve Plaintiffs' claims for a violation of the automatic stay provision in 11 U.S.C. § 362. *See In re THG Holdings LLC*, 604 B.R. 154, 159–60 (Bankr. D. Del. 2019) ("Because the only issue is whether the withholding of post-petition reimbursements is a violation of the automatic stay, it is not, as the Defendants argue, inextricably intertwined with pre-petition fiscal reimbursement determinations."); *see also In re Town & Cntry. Home Nursing Servs.*, 963 F.2d at 1154 ("[W]here there is an independent basis for bankruptcy court jurisdiction, exhaustion of administrative remedies pursuant to other jurisdictional statutes is not required.").

88.    Second, there are no procedural barriers to the Court adjudicating Plaintiffs' claim under the Medicare Act either. Section 405(g) imposes two requirements: "first, a 'jurisdictional' requirement that claims be presented to the agency, and second, a 'waivable ... requirement that the administrative remedies prescribed by the Secretary be exhausted.'" *Smith v. Berryhill*, 587 U.S. 471, 478 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976)); *D&G Holdings, LLC v. Becerra*, 22 F.4th 470, 475 (5th Cir. 2022) (same).

89.    The first requirement, presentment "requires nothing more" than requesting from the agency "the specific relief" sought. *Steigerwald v. Comm'r of Social Sec.*, 48 F.4th 632, 638 (6th Cir. 2022). This requirement was satisfied on September 29, 2025, when Plaintiffs filed a request for a hearing, the first step of the prescribed agency review process. *See* 42 C.F.R. § 498.40.

90.    The second requirement, exhaustion, is excusable if "irreparable injury will result absent immediate judicial review." *Gulf Restoration Network v. Salazar*, 683 F.3d 158, 176 (5th

Cir. 2012) (citation omitted). Because irreparable harm will result to Plaintiffs and the residents of Magnolia Ridge without judicial review, the second requirement—exhaustion—"should not be required." *Baldwin Metals Co. v. Donovan*, 642 F.2d 768, 773 (5th Cir. 1981).

## COUNT I
### Violation of the Automatic Stay Under 11 U.S.C. § 362(a)

91.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

92.    Section 362(a) of the Bankruptcy Code operates as an automatic stay that protects debtors and the bankruptcy estate. *See* 11 U.S.C. § 362(a).

93.    Defendants' termination of Magnolia Ridge's Provider Agreement and threatened collection of CMPs are willful violations of the automatic stay.

94.    Bankruptcy Code Section 362(k) provides that a party "injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k).

95.    Plaintiffs have been damaged by Defendants' willful violations of the automatic stay.

96.    Plaintiffs request that the Court enter a judgment in favor of Plaintiffs and against Defendants awarding actual damages, including costs and attorneys' fees, in accordance with Section 362(k) of the Bankruptcy Code, in an amount to be proven at trial.

## COUNT II
### Injunctive Relief Under 11 U.S.C. § 105

97.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

98.    Bankruptcy Code Section 105(a) authorizes the Court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a).

99.     Bankruptcy Rule 7065 expressly permits the bankruptcy court to issue temporary restraining orders and preliminary injunctions in adversary proceedings. *See* Fed. R. Bankr. P. 7065 (incorporating Federal Rule 65 in adversary proceedings).

100.     Plaintiffs respectfully request that this Court enter a temporary restraining order and preliminary injunction staying the termination of Magnolia Ridge's Provider Agreement until further order of this Court. Without such relief, Plaintiffs will suffer substantial and irreparable harm, as terminating the Facility's Provider Agreement may cause a cascade of defaults—most notably, a breach of the Master Lease and the DIP Credit Agreement, which will significantly impair Plaintiffs' restructuring efforts. Further, allowing termination could jeopardize the health and safety of the residents of Magnolia Ridge, who would be forced to leave their homes and be placed in a new facility, which is a traumatic event for elderly and vulnerable residents.

101.     An injunction is therefore warranted under 11 U.S.C. § 105(a).

### COUNT III
### Declaratory Relief Under 11 U.S.C. § 105; 28 U.S.C. §§ 2201, 2202

102.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

103.     The Bankruptcy Court "[u]ndoubtedly … has the power to render declaratory relief under the Code." *In re Spencer*, 7 B.R. 458, 460 (Bankr. S.D. Cal. 1980); *see* 28 U.S.C. § 2201; *id.* § 451 (defining "court of the United States" in § 2201 to include bankruptcy courts).

104.     There exists a substantial, actual controversy between the Plaintiffs and Defendants of sufficient immediacy and reality to warrant the issuance of a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202. Declaratory judgment is also necessary and appropriate in this matter to enable the court to "carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a).

105.     Plaintiffs respectfully request that this Court issue a final, declaratory judgment that:

a.     Plaintiffs' right to submit claims and receive Medicare reimbursements under the Provider Agreement is property of the estate under 11 U.S.C. § 541;

b.     CMS's termination of the Provider Agreement was prohibited by 11 U.S.C. § 362 and therefore void;

c.     CMS's imposition and collection of CMPs, including by withholding valid Medicare Reimbursement amounts for services that have been provided to beneficiaries, is prohibited by 11 U.S.C. § 362;

d.     CMS's actions are not exempt from the automatic stay under 11 U.S.C. § 362(b)(4); and

e.     that Defendants may not terminate the Provider Agreement or collect CMPs until further order of this Court.

**COUNT IV**
**The Secretary's Termination Decision Is Unlawful**
**(42 U.S.C. §§ 405(g), 1395ii; 5 U.S.C. § 706(2))**

106.    Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

107.    A court must set aside a termination decision that lacks the support of substantial evidence, is arbitrary and capricious, is an abuse of discretion, or is contrary to law. *See* 42 U.S.C. §§ 405(g), 1395ii; 5 U.S.C. § 706(2).

108.    CMS's decision that Magnolia Ridge's deficiencies "immediately jeopardize[d] the health or safety" of its residents lacks any evidentiary basis. 42 U.S.C. § 1395i-3(h)(2)(A)(i). The single unabated immediate jeopardy that gave rise to the termination—the May 16, 2025 dentist's office elopement—did not jeopardize the health of that resident, and the issue was fully abated and corrected afterwards.

109.    Accordingly, the termination of the Provider Agreement and incorporated admissions ban was unlawful and should be set aside.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in its favor and against Defendants in the claims set forth above and respectfully request that this Court:

A.  enter preliminary and permanent relief staying termination of the Provider Agreement;

B.  enter preliminary and permanent relief enjoining Defendants from interference with readmitting residents who left Magnolia Ridge due to CMS's unlawful termination and wish to return;

C.  enter preliminary and permanent relief staying Defendants' enforcement of the new admissions ban;

D.  enjoin Defendants from further violations of Bankruptcy Code Section 362(a)e;

E.  issue declaratory judgment in favor of the Plaintiffs as set forth in Count III;

F.  award Plaintiffs damages, including actual damages, costs, and attorneys' fees stemming from Defendants' violations of the Bankruptcy Code;

G.  set aside CMS's Termination Notice; and

H.  award any further relief that this Court deems just, equitable, and proper.

Dated:  September 30, 2025

Respectfully submitted,

/s/ *Daniel M. Simon*

Paul W. Hughes (*pro hac vice* to be filed)
Sarah P. Hogarth (*pro hac vice* to be filed)
Grace Wallack (*pro hac vice* to be filed)
Aleena Ijaz (*pro hac vice* to be filed)
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8988
phughes@mwe.com

Matthew L. Knowles (*pro hac vice* to be filed)
MCDERMOTT WILL & SCHULTE LLP
200 Clarendon Street, Floor 58
Boston, MA 02116
(617) 535-4000
mknowles@mwe.com

Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Catherine T. Lee (admitted *pro hac vice*)
Landon W. Foody (admitted *pro hac vice*)
MCDERMOTT WILL & SCHULTE LLP
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
(312) 372-2000
dsimon@mwe.com

Marcus A. Helt (TX 24052187)
Jack G. Haake (TX 24127704)
MCDERMOTT WILL & SCHULTE LLP
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201
(214) 295-8000
mhelt@mwe.com

*Attorneys for Plaintiffs and Debtors-in-Possession*