## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re:<br><br>GENESIS HEALTHCARE, INC., et al.,[1]<br><br>          Debtors. | Chapter 11<br><br>Case No. 25-80185 (SGJ)<br>(Jointly Administered) |
| SUNBRIDGE GARDENDALE HEALTH CARE CENTER, LLC and GENESIS HEALTHCARE, INC..,<br><br>          Plaintiffs,<br><br>   v.<br><br>ROBERT F. KENNEDY, JR., et al.,<br><br>          Defendants. | Adversary Proceeding No._____ |

**PLAINTIFFS' BRIEF IN SUPPORT OF <u>EMERGENCY</u> MOTION FOR PRELIMINARY INJUNCTION AS TO THE MAGNOLIA RIDGE CENTER**

---

[1] The last four digits of Genesis Healthcare, Inc.'s federal tax identification number are 4755. There are 299 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Genesis. The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

## TABLE OF CONTENTS

Table of Authorities ....................................................................................................... ii

Introduction ................................................................................................................... 1

Background ..................................................................................................................... 2

    A.   Statutory and regulatory background ........................................................................2

    B.   Factual background ...................................................................................................3

    C.   Procedural background...............................................................................................6

Argument: The Court should enter the requested injunctive relief................................ 7

    A.   Plaintiffs are likely to succeed on the merits. ........................................................8

         1.   CMS's termination of Magnolia Ridge's agreement is unlawful. .........................8

         2.   CMS's termination of the provider agreement and threat to collect
penalties violates the automatic stay...................................................................13

         3.   There are no procedural barriers to granting relief. ..............................................17

    B.   Plaintiffs will likely suffer serious irreparable harm absent injunctive relief. .............20

    C.   The balance of equities and public interest favors the requested injunction................24

Conclusion ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Adams EMS, Inc. v. Azar*,
   2018 WL 5264244 (S.D. Tex. Oct. 23, 2018)......................................................24

*Affiliated Pro. Home Health Care Agency v. Shalala*,
   164 F.3d 282 (5th Cir. 1999) ...............................................................................19

*In re Bayou Shores SNF, LLC*,
   525 B.R. 160 (Bankr. M.D. Fla. 2014) ..................................................14, 20, 23

*In re Benjamin*,
   932 F.3d 293, 295 (5th Cir. 2019) .......................................................................18

*In re Berkelhammer*,
   279 B.R. 660 (Bankr. S.D.N.Y. 2002)..................................................................16

*In re Bernhard Steiner Pianos USA, Inc.*,
   292 B.R. 109 (Bankr. N.D. Tex. 2002)..................................................................21

*California ex rel. Brown v. Villalobos*,
   453 B.R. 404 (D. Nev. 2011) ................................................................................15

*Campbell v. Countrywide Home Loans, Inc.*,
   545 F.3d 348 (5th Cir. 2008) ................................................................................13

*In re Chiron Equities, LLC*,
   552 B.R. 674 (Bankr. S.D. Tex. 2016) .................................................................24

*Claridge House, Inc. v. HHS*,
   795 F. Supp. 1393 (S.D. Ohio 1991) ....................................................................11

*In re Commonwealth Cos.*,
   913 F.2d 518 (8th Cir. 1990) ................................................................................17

*In re Commonwealth Oil Ref. Co.*,
   805 F.2d 1175 (5th Cir. 1986) ................................................................................7

*In re Corporacion de Servicios Medicos Hospitalarios de Fajardo*,
   805 F.2d 440 (1st Cir. 1986)....................................................................16, 17, 21

*D&G Holdings, LLC v. Becerra*,
   22 F.4th 470 (5th Cir. 2022) ................................................................................19

*Duncan v. Heinrich*,
   591 B.R. 652 (M.D. La. 2018)..............................................................................14

*In re Eagle-Picher Indus., Inc.*,
   963 F.2d 855 (6th Cir. 1992) ..................................................................................7

*In re Elcoteq, Inc.*,
   521 B.R. 189 (Bankr. N.D. Tex. 2014)..................................................................13

*Fam. Rehab., Inc. v. Azar*,
   886 F.3d 496 (5th Cir. 2018) ................................................................................19

**Cases—continued**

*In re FiberTower Network Servs. Corp.*,
   482 B.R. 169 (Bankr. N.D. Tex. 2012) ...........................................................7

*First Am. Health Care of Ga., Inc. v. HHS*,
   1996 WL 282149 (Bankr. S.D. Ga. Mar. 11, 1996) ............................14

*First Am. Health Care of Ga. Inc. v. HHS*,
   208 B.R. 985 (Bankr. S.D. Ga. 1996) ..............................................14

*Fruth, Inc. v. Pullin*,
   2015 WL 9451066 (S.D.W. Va. 2015) .............................................24

*Golden Living Ctr. - Mountain View v. Sec'y of HHS*,
   832 F. App'x 967 (6th Cir. 2020) ...................................................12

*GOS Operator, LLC v. Sebelius*,
   2012 WL 175056 (S.D. Ala. Jan. 20, 2012) ...............................22, 23

*Grace Healthcare of Benton v. HHS*,
   603 F.3d 412 (8th Cir. 2009) ......................................................9, 12

*In re Halo Wireless, Inc.*,
   684 F.3d 581 (5th Cir. 2012) .........................................................15

*In re Healthback, LLC*,
   226 B.R. 464 (Bankr. W.D. Okla. 1998) ....................................18, 19

*Heckler v. Ringer*,
   466 U.S. 602 (1984)........................................................................19

*In re Heritage Sw. Med. Grp., P.A.*,
   309 B.R. 916 (Bankr. N.D. Tex. 2004)............................................20

*Honey Grove Nursing Ctr. v. HHS*,
   606 F. App'x 164 (5th Cir. 2015) ...................................................11

*Hosp. v. Burwell*,
   76 F. Supp. 3d 224 (D.D.C. 2014)..................................................24

*Int'l Long Term Care v. Shalala*,
   947 F. Supp. 15 (D.D.C. 1998) ......................................................23

*In re Keene Corp.*,
   162 B.R. 935 (Bankr. S.D.N.Y. 1994)..............................................7

*In re Kemp*,
   52 F.3d 546 (5th Cir. 1995) ...........................................................15

*In re King Mem'l Hosp., Inc.*,
   4 B.R. 704 (Bankr. S.D. Fla. 1980)................................................17

*Med-Cert Home Care, LLC v. Azar*,
   365 F. Supp. 3d 742 (N.D. Tex. 2019) ......................................22, 24

**Cases—continued**

*Mediplex of Mass., Inc. v. Shalala*,
39 F.Supp.2d 88 (D. Mass. 1999) .......................................................23

*Miss. Care Ctr. of Greenville v. HHS*,
517 F. App'x 209 (5th Cir. 2013) ......................................................11

*In re Moss*,
270 B.R. 333 (Bankr. W.D.N.Y. 2001) ............................................13

*Mountainview Nursing and Rehab. Ctr., Inc. v. HHS*,
No. 1:CV-93-1692, slip op. (M.D. Pa. Nov. 18, 1993).....................11

*Oak Park Health Care Ctr., LLC v. Johnson*,
2009 WL 331563 (W.D. La. Feb. 10, 2009).....................................23

*In re OGA Charters, LLC*,
554 B.R. 415 (Bankr. S.D. Tex. 2016) ...............................................8

*In re Psychotherapy & Counseling Ctr., Inc.*,
195 B.R. 522 (Bankr. D.C. 1996) .................................................14, 15

*In re Seatco, Inc.*,
257 B.R. 469 (Bankr. N.D. Tex. 2001).............................................21

*In re Seven Seas Petrol., Inc.*,
522 F.3d 575 (5th Cir. 2008) .............................................................14

*Smith v. Berryhill*,
587 U.S. 471 (2019).............................................................................19

*Somerset Nursing & Rehab. Facility v. HHS*,
502 F. App'x 513 (6th Cir. 2012) .................................................10, 11

*St. Paul Fire & Marine Ins. Co. v. Labuzan*,
579 F.3d 533 (5th Cir. 2009) .............................................................13

*Steigerwald v. Comm'r of Social Sec.*,
48 F.4th 632 (6th Cir. 2022) ..............................................................19

*In re THG Holdings*,
604 B.R. 154 (Bankr. D. Del. 2019) .......................................18, 21, 24

*In re Town & Country Home Nursing Servs., Inc.*,
963 F.2d 1146 (9th Cir. 1991) ...........................................................18

*Univ. Med. Ctr. v. Sullivan*,
122 B.R. 919 (E.D. Pa. 1990) ............................................................15

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008)..................................................................................8

*In re With Purpose, Inc.*,
654 B.R. 715 (Bankr. N.D. Tex. 2023)..............................................18

*In re Wood*,
825 F.2d 90 (5th Cir. 1987) ...............................................................18

iv

## Statutes and Regulations

11 U.S.C.

§ 105(a) ........................................................................................................7, 17, 19
§ 157 .........................................................................................................................18
§ 362 .......................................................................................................14, 15, 17, 18
§ 362(a)(1) ..............................................................................................................14
§ 362(a)(3) ..............................................................................................................14
§ 362(b)(4) ...................................................................................................15, 16, 17
§ 363 .........................................................................................................................18
§ 365 .........................................................................................................................18
§ 704(a)(12) .....................................................................................................10, 22

28 U.S.C.

§ 1331 .......................................................................................................................18
§ 1334 .......................................................................................................................18
§ 1334(b) ..................................................................................................................18
§ 1346 .......................................................................................................................18

42 U.S.C.

§ 405 ...................................................................................................................18, 19
§ 405(g) ....................................................................................................................19
§ 405(h) ....................................................................................................................18
§ 1395i-3 ...................................................................................................................2, 8
§ 1395i-3(h) ..............................................................................................................11
§ 1395i-3(h)(1)(A) ............................................................................................3, 16, 17
§ 1395i-3(h)(2)(A)(i) .........................................................................................passim
§ 1395i-3(h)(2)(A)(ii) .....................................................................................3, 11
§ 1395i-3(h)(2)(B) ...........................................................................................3, 11
§ 1395i-3(h)(2)(B)(iii) .....................................................................................16, 17

42 C.F.R.

§ 488.301 ...................................................................................................................8
§ 488.406 ...................................................................................................................3
§ 488.454(a) ....................................................................................................3, 13, 25
§ 488.456(b)(1)(i) ...................................................................................................11
§ 498.40 .....................................................................................................................19

## Other Authorities

CMS, *State Operations Manual: Appendix Q—Core Guidelines for Determining
Immediate Jeopardy* (Dec. 13, 2024)...................................................................8, 9

## INTRODUCTION

Relief on this motion is the only way to ensure stability for residents of the Magnolia Ridge Center in Gardendale, Alabama. Without relief, the Centers for Medicare & Medicaid Services will terminate Magnolia Ridge's participation in Medicare and Medicaid once this Court's order temporarily enjoining the termination expires. A preliminary injunction is urgently warranted to ensure Magnolia Ridge may continue serving residents.

CMS attempted to terminate Magnolia Ridge's Medicare and Medicaid participation based largely on a single outstanding immediate jeopardy finding for which regulators have refused to accept Magnolia Ridge's substantial abatement plans. In that incident, a resident walked across the street after a dentist's appointment to purchase a card for their mother; the resident suffered no harm, nor was at a material risk for any harm, given high cognitive function. Still, Magnolia Ridge has undertaken radical change since that May 16 incident, overhauling its leadership, policies, procedures, and training to ensure that its residents receive safe and high-quality care. CMS is nonetheless characterizing that pre-petition incident as an "immediate jeopardy" that requires terminating Magnolia Ridge's participation. And CMS is threatening to withhold sizeable civil monetary penalties from Magnolia Ridge's reimbursements.

The Court should grant preliminary injunctive relief, ensuring access to CMS payments.

*First*, Magnolia Ridge is likely to succeed on its claims that CMS's termination is unlawful on its own terms and violates the automatic stay. As to the substance of CMS's termination, the purported "immediate jeopardy" incident cited as the basis for the termination caused *no* harm. And Magnolia Ridge promptly implemented a comprehensive plan of correction for issues the state survey identified. As a result, CMS's "immediate jeopardy" designation is far removed from the facts on the ground at Magnolia Ridge, where residents are receiving safe, adequate, and quality care, as confirmed by the patient care ombudsman (PCO). Separately, CMS's attempt to

1

terminate a contract based on pre-petition circumstances likely violates the automatic stay, as does CMS's threat to withhold civil monetary penalties from Magnolia Ridge's reimbursements.

*Second*, Magnolia Ridge and its residents are likely to suffer substantial irreparable harm absent relief. Termination risks triggering defaults under Plaintiffs' lease agreement and DIP Credit Agreement, necessitating renegotiation of the terms of the current stalking horse bid and potential delay of the auction date, significantly interfering with Plaintiffs' ongoing restructuring and sale efforts. It would also further seriously deplete Magnolia Ridge's revenues, limiting its ability to provide services. And termination would also be devastating—and dangerous—for residents who will have to be transferred out of their homes to other facilities that also maintain a reasonable quality of care. By contrast, enjoining termination and permitting Magnolia Ridge to continue receiving reimbursements and admitting new residents during the pendency of these proceedings and agency review will not cause any harm to CMS given Magnolia Ridge's demonstrated efforts to enhance its services and resident care.

Magnolia Ridge takes seriously its obligation to deliver safe and high-quality care to residents. The Court should not permit CMS to jeopardize these Chapter 11 proceedings, Magnolia Ridge's viability, and the health of Magnolia Ridge's residents on account of CMS's unsupported and unnecessary provider-agreement termination. The Court should enter injunctive relief preliminarily setting aside the termination and incorporated admissions ban and penalty collection.

## BACKGROUND

### A.    Statutory and regulatory background

To receive payment under the Medicare and Medicaid programs, a skilled nursing facility must comply with federal statutory and regulatory requirements. *See* 42 U.S.C. § 1395i-3 (governing "[r]equirements for, and assuring quality of care in, skilled nursing facilities"). A state survey agency monitors compliance with these requirements through periodic surveys. If the State finds

that a facility "no longer meets a requirement" pertaining to provision of services, or administration and other matters, "and further finds that the facility's deficiencies … immediately jeopardize the health or safety of its residents," then the State shall recommend that the Secretary take certain enforcement actions. *Id.* § 1395i-3(h)(1)(A).

On reviewing the state reports, if the Secretary finds a violation of the statute *and* "further finds" that the "facility's deficiencies … immediately jeopardize the health or safety" of its residents, then the Secretary must "take immediate action to remove the jeopardy and correct the deficiencies through the [appointment of temporary management], or terminate the facility's participation." 42 U.S.C. § 1395i-3(h)(2)(A)(i). That is, when faced with immediate jeopardy, the Secretary has the option to appoint temporary management *or* terminate the provider's agreement. The Secretary may seek other remedies, including civil monetary penalties. *Id.*; *see* 42 C.F.R. § 488.406. If, however, the Secretary finds that deficiencies "do not immediately jeopardize the health and safety of its residents," he has a range of alternative remedies to ensure improvement at the facility, none of which include terminating the facility's participation. 42 U.S.C. § 1395i-3(h)(2)(A)(ii), (h)(2)(B). These alternative remedies continue until CMS finds "substantial compliance" or "terminates the provider agreement." 42 C.F.R. § 488.454(a).

## B.    Factual background

Magnolia Ridge is a 148-bed skilled nursing facility in Gardendale, Alabama. App. 2. The facility offers post-hospital, short-term rehabilitation and long-term and respite care services. *Id.* Magnolia Ridge is rated as a two-star facility on Medicare.gov and is rated 5/5 stars on quality measures—significantly higher than the national average. *See* Magnolia Ridge, Medicare.gov [tinyurl.com/9y26xctc] (last visited Sept. 24, 2025) (showing better performance than the national and Alabama average on measures of patient quality measures). Magnolia Ridge enjoys a positive reputation in the community for both short- and long-term care. App. 12.

The Alabama Department of Public Health (ADPH) had not conducted an annual survey of Magnolia Ridge since 2019. App. 3, 9. It only conducted infection control and complaint-based surveys in 2020, 2021, and 2022 and no surveys of Magnolia Ridge at all in 2023 or 2024. App. 9. In spring 2025, however, ADPH began a flurry of activity at Magnolia Ridge. ADPH conducted three surveys—on March 2, 2025, May 6, 2025, and August 17, 2025. App. 354, 492, 707. Those surveys produced a slew of citations, most of which stemmed from only three incidents:

- **February 1, 2025**: A resident went across the street from the facility unattended. App. 431-432. Magnolia Ridge received a citation on March 13, 2025. ADPH accepted Magnolia Ridge's abatement plan on March 15. App. 359.

- **April 1, 2025**: A resident struck another with a closed first. App. 511. Magnolia Ridge received citations on May 13, 2025, and May 15, 2025, with reissued citations on May 28, 2025. App. 497. ADPH accepted Magnolia Ridge's abatement plan on June 4, 2025. *Id.*

- **May 16, 2025:** A resident went to a nearby CVS pharmacy unattended after a dentist appointment to get a card for their mother. App. 722-723. Magnolia Ridge received citations on August 22, 2025. App. 707. It submitted abatement plans three times—on August 22, August 28, and September 1—but ADPH refused to accept them. App. 142-304.

Magnolia Ridge has undertaken substantial efforts to ensure safe and high-quality care. For the February 1 incident, after ADPH cited Magnolia Ridge with immediate jeopardy on March 13, Plaintiffs immediately implemented abatement measures, and the very next day, surveyors verified onsite that corrective measures had been implemented and the immediate jeopardy was removed on March 15, 2025. App. 359. Magnolia Ridge also completed a plan of correction for the other incidents identified in the March survey, which alleged that Magnolia Ridge was in substantial compliance by April 17. App. 36-47. ADPH accepted that plan of correction. App. 14.

For the April 1, 2025 incident, Magnolia Ridge immediately placed the resident on a safety code with a psychologist evaluation and separated the two residents. App. 105. A verbal confrontation between the two residents occurred on May 8, 2025, leading to another immediate jeopardy citation. App. 512 4. Magnolia Ridge drafted removal plans for these immediate jeopardy citations, but ADPH did not accept the removal plans. App. 10. Rather than give Magnolia Ridge a chance to abate the immediate jeopardies, ADPH issued two more immediate jeopardy citations for the same April 1 incident on May 15, 2025. App. 496-497.

Still determined to deliver high-quality care, on May 24, 2025, Genesis overhauled the leadership at Magnolia Ridge and hired a new Administrator and Director of Nursing. The new team prepared plans of removal and implemented plans of correction, changes to policies and protocols, and new training for staff. App. 3, 9-10. Despite presenting thorough plans of removal during the May revisit survey, ADPH continually rejected Magnolia Ridge's abatement plans. App. 9-10. ADPH's rejection stemmed not from the substance of the plans but because the written submission failed to include a percentage breakdown of re-educated staff and because of other formatting and wording issues. App. 10. After repeated rejections of Magnolia Ridge's removal plans, ADPH finally accepted removal of all immediate jeopardies as of June 4, 2025. App. 497.

ADPH then returned for a second revisit from August 17 to August 23, 2025, this time with a team of roughly twelve surveyors. App. 10. On August 22, ADPH issued another seven immediate jeopardy citations, all relating to the May 16 incident in which a resident left a dentist's office to pick up a card for their mother—and which occurred before Magnolia Ridge's change in leadership. App. 10; App. 743-744. Although the resident had a BIMS score of 15 out of 15 (indicating no cognitive impairment), was returned to Magnolia Ridge safely, and was not assessed for wandering given the resident's understanding and low risk of doing so again (App. 737, 741, 743),

surveyors issued seven immediate jeopardy citations based on this incident. App. 10. And they did

so without even interviewing the resident (*see* App. 706-770), an unusual practice.

Magnolia Ridge submitted removal plans for the immediate jeopardy citations stemming

from this incident on three separate occasions—August 22, August 28, and September 1, 2025—

and attempted to hand-deliver removal plans to onsite surveyors, who refused to accept them. App.

22, 142-304. As a result, Magnolia Ridge has seven immediate jeopardy citations that are techni-

cally unabated, all for an incident that occurred months ago and for which there is no current

danger to any resident. *See* App. 5, 18-19.

### C.    Procedural background

Despite Magnolia Ridge's corrective measures and cooperation with ADPH, on September

4, 2025, CMS provided the facility with a notice of involuntary termination effective September

15, 2025. App. 883-889. After receiving the notice, Plaintiffs provided ADPH and CMS with yet

more documentation reflecting abatements of the purported deficiencies and a proposed closure

plan if termination remained. *See* App. 305-352. Nonetheless, CMS refused to change its decision

to terminate Magnolia Ridge's Provider Agreement and to resume serving new residents. CMS

also refused to approve Magnolia Ridge's draft letter informing families of the potential closure,

causing further uncertainty for Magnolia Ridge's residents and their families. App. 11.

Plaintiffs quickly requested an emergency hearing before this Court regarding the termina-

tion of Magnolia Ridge's Provider Agreement. During that September 15 hearing, patient care

ombudsman Suzanne Koenig provided a Special Report and testified that, based on her observa-

tions of Magnolia Ridge and interviews with capable and competent staffing residents, doctors,

nurse practitioners, and families over the last 30 days, she "did not know" why the facility's Pro-

vider Agreement was being terminated and that, to her, "the [F]acility was running fine." Hr'g Tr.

at 16:59-17:35. She testified that she had "been in many facilities" and may have seen imminent

danger "somewhere else," but, in her view, Magnolia Ridge was "not in imminent danger." *Id.*
Although the uncertainty caused by the Termination Notice has meant that many residents have
elected to transfer to other facilities as the opportunity arose, the residents that remain at Magnolia
Ridge are happy with the care being provided and would prefer to stay in their homes if possible.
App. 11-12. The facility has enough staff for 100 residents, even though it is currently home to
approximately half that many. *Id.* Many residents who transferred to other facilities have expressed
their desire to return to Magnolia Ridge. App. 11.

The Court granted a temporary injunction preventing termination through September 30,
2025. Dkt. 924. Plaintiffs appealed the termination within CMS on September 29, 2025 (App. 872-
882), but CMS has yet to act. As a result, without relief from this Court, the termination will take
effect absent further Court order, notwithstanding the ongoing agency appeal process.

## ARGUMENT:
## THE COURT SHOULD ENTER THE REQUESTED INJUNCTIVE RELIEF.

Relief from this Court is imperative to prevent irreparable harms stemming from Magnolia
Ridge's termination during the pendency of bankruptcy and agency proceedings.

Bankruptcy Code Section 105(a) provides the Court with a "broad grant of power" to "as-
sure the orderly conduct of the reorganization proceedings." *In re Keene Corp.*, 162 B.R. 935, 944
(Bankr. S.D.N.Y. 1994); *see also In re FiberTower Network Servs. Corp.*, 482 B.R. 169, 182
(Bankr. N.D. Tex. 2012) (Section 105 permits "actions necessary to protect the integrity of the
bankrupt's estate and enjoin actions that might impede the reorganization process").

When granting preliminary injunctive relief under Section 105(a), the Court considers the
four factors governing preliminary injunctive relief. *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855,
858 (6th Cir. 1992); *see In re Commonwealth Oil Ref. Co.*, 805 F.2d 1175, 1188-1189 (5th Cir.
1986). The movant must show: (1) that it is "likely to succeed on the merits," (2) that it is "likely

to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in [its] favor," and (4) "that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). While a movant must show "both a likelihood of success on the merits and of suffering irreparable harm," a "strong likelihood" on one factor produces a "lower standard" on the other. *In re OGA Charters, LLC*, 554 B.R. 415, 425 (Bankr. S.D. Tex. 2016).

Plaintiffs satisfy all four factors and are thus entitled to a preliminary injunction.

### A.    Plaintiffs are likely to succeed on the merits.

Plaintiffs are likely to succeed in showing that CMS lacks sufficient basis to terminate Magnolia Ridge's Provider Agreement and that CMS violated the automatic stay in attempting to terminate an agreement and to collect penalties during the pendency of bankruptcy proceedings.

### *1.    CMS's termination of Magnolia Ridge's agreement is unlawful.*

Plaintiffs are likely to prevail against CMS because its immediate jeopardy finding is unsupportable by substantial evidence, and any suggestion that Magnolia Ridge was not in substantial compliance with program requirements is also unsupported by substantial evidence.

**a.** Under Section 1395i-3, CMS has authority to terminate a SNF's Provider Agreement *only* if it finds both noncompliance with a statutory requirement *and* "that the facility's deficiencies … immediately jeopardize the health or safety of its residents." *See* 42 U.S.C. § 1395i-3(h)(2)(A)(i). An "immediate jeopardy" is serious: it is "a situation in which the provider's noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301. For such a harm to be "likely," CMS must conclude that "the nature and/or extent of the identified noncompliance creates a reasonable expectation that an adverse outcome resulting in serious injury, harm, impairment, or death will occur if not corrected." CMS, *State Operations Manual: Appendix Q—Core Guidelines for Determining Immediate Jeopardy* § III (Dec. 13, 2024) (emphasis added). It takes a very severe

harm to give rise to an immediate jeopardy finding—like "death, loss of a limb, or permanent disfigurement," or "sexual abuse." *Id*. § V. Before making such a finding, it is "essential" that there be a "need for immediate corrective action by the supplier/provider to prevent serious injury, serious harm, serious impairment or death from occurring or recurring." *Id*. § IV.

None of CMS's identified regulatory deficiencies rise to the level of causing or being likely to cause serious injury, harm, impairment, or death to a resident. *See Grace Healthcare of Benton v. HHS*, 603 F.3d 412, 421 (8th Cir. 2009) (distinguishing between the issues of whether there was a "low-level violation" and whether the violation "caused, or [was] likely to cause, serious injury, harm, impairment, or death to a resident" (quoting 42 C.F.R. § 488.301) (alteration in original)). Plaintiffs are thus likely to succeed in demonstrating that CMS's decision to terminate on the basis of an immediate jeopardy finding was unlawful.

Although the ADPH reports included several citations, they stem from only a few incidents, all of which occurred *before* Magnolia Ridge instituted a complete overhaul in leadership, and all of which were abated. *See supra* at 4-6; App. 3, 9-10. The only immediate jeopardy citation for which ADPH refuses to accept an abatement plan, despite Magnolia Ridge making several attempts to submit such a plan, concerns one incident where a resident who was supposed to be picked up after a dentist's appointment instead walked across the street to a CVS pharmacy to purchase a card for their mother. App. 743-744. The resident was not assessed for wandering even after the incident because family confirmed that the resident is not a wanderer and had never tried to leave Magnolia Ridge. App. 741. In issuing almost ten immediate jeopardy citations based on this incident, surveyors did not even interview the resident. *See* App. 706-770.

The PCO "personally spoke with the resident who is the subject of [the most recent] of the immediate jeopardy citations, and the resident confirmed that they were not harmed." App. 5. In

response to the incident, Magnolia Ridge implemented staff education and updated its policies to ensure the incident would not occur again—by requiring and contracting to ensure that an escort remains with a resident regardless of the resident's cognitive function. App. 249-250.

These remedial measures have been effective—as confirmed by the Special Report of the PCO and declarations from Magnolia Ridge's Medical Director Dr. Prince, its Administrator Sharon Warren, and Genesis's Associate Chief Clinical Officer Janice Thorpe. The PCO found, based on her observations since the bankruptcy filing, that Magnolia Ridge "provides quality and safe care to its residents, is an asset to the communities it serves, and does not pose imminent danger to the current residents." App. 2, 4. She found that Magnolia Ridge "had sufficient supplies and food items to meet residents' needs" (App. 4); that "[r]esidents reported being satisfied with care, activities, and meals" (App. 5); and that "Magnolia Ridge and the Debtors' corporate team have drafted plans of correction" and are "actively completing audits and reviews of residents' clinical records to ensure implementation of the plan of correction" (App. 3, 4). Magnolia Ridge continues to be fully staffed and provides quality care to the residents that live there. App. 11-12, 19.

This single isolated incident, coupled with Magnolia Ridge's comprehensive corrective actions and lack of any elopement issues since new leadership took over on May 24, establishes that there was no immediate jeopardy in August when CMS issued its termination decision. It is evident that Magnolia Ridge "maintains a reasonable quality of care." *See* 11 U.S.C. § 704(a)(12).

Magnolia Ridge's circumstances stand in stark contrast to other instances where courts have upheld CMS's findings of immediate jeopardy after repeated attempts at intervention failed to correct a serious problem. In *Somerset Nursing*, for example, CMS found that a facility had failed to protect residents from risk of serious harm after one resident engaged in "verbal and physical violence" and "sexual abuse against some female residents" over many months. *Somerset*

*Nursing & Rehab. Facility v. HHS*, 502 F. App'x 513, 518 (6th Cir. 2012). Although the facility

implemented monitoring, sent the resident for a psychiatric consultation, sought assistance from

his family, and threatened to discharge him (*id.* at 519), further incidents involving the same resi-

dent occurred in June, July, August, October, and January. *Id.* at 519-520. The court found even

*those facts* to be "a close call" as to immediate jeopardy, but it ultimately found sufficient evidence

to affirm CMS's finding that the resident's "persistent conduct" and failure of corrective measures

represented immediate jeopardy to the other residents. *Id.* at 520-521 (emphasis added); *see also*

*id.* at 522 (Siler, J., concurring in part and dissenting in part) (noting that, "[a]lthough the conduct

of Resident # 9 is not to be condoned," "I depart from the majority when it finds that there was

sufficient evidence to affirm … the immediate jeopardy finding").

Nothing akin to the kind of serious, ongoing, and unabated risk found in *Somerset Nursing*

exists at Magnolia Ridge—and CMS identified none. The resident is not at risk of wandering, has

had no repeat issues or elopement concerns, and Magnolia Ridge implemented substantial plans

of correction that successfully abated the issue. *Compare* 502 F. App'x at 519-520; *Miss. Care*

*Ctr. of Greenville v. HHS*, 517 F. App'x 209, 215 (5th Cir. 2013) (repeated attempts by same

resident to elope supported immediate jeopardy finding); *Honey Grove Nursing Ctr. v. HHS*, 606

F. App'x 164, 168 (5th Cir. 2015) (substantial evidence to support immediate jeopardy when res-

ident's "chart was replete with evidence that his aggressive behavior had been escalating").[2]

---

[2]   To the extent CMS suggests it may terminate Magnolia Ridge's participation without an immediate jeopardy
finding under 42 C.F.R. § 488.456(b)(1)(i), that is contrary to statute. 42 U.S.C. § 1395i-3(h) clearly distinguishes
between remedies CMS "shall" impose upon finding that a nursing "facility's deficiencies … immediately jeopardize
the health or safety of its residents"—which include termination (*id.* § 1395i-3(h)(2)(A)(i))—and those CMS "may"
impose absent such a finding, which do not include termination (*id.* § 1395i-3(h)(2)(A)(ii), (h)(2)(B)). Courts thus
hold that CMS must make a supportable finding of immediate jeopardy before terminating a nursing facility's provider
agreement. *See Claridge House, Inc. v. HHS*, 795 F. Supp. 1393, 1404 (S.D. Ohio 1991) (concluding that CMS may
not terminate a nursing facility's participation in the Medicaid program "absent a finding that the facility's deficiencies
immediately jeopardize the health or safety of its residents"); *Mountainview Nursing and Rehab. Ctr., Inc. v. HHS*,
No. 1:CV–93–1692, slip op. at 6-7 (M.D. Pa. Nov. 18, 1993) (Section 1395i–3(h)(2) "bestows termination authority
upon the Secretary only when there had been a finding of immediate jeopardy to the residents").

**b.** The Termination Notice also alleges that Magnolia Ridge was "not in substantial compliance with the participation requirements" "for long-term care facilities participating in the Medicare and Medicaid programs." App. 844. But this lacks substantial evidence too. Magnolia Ridge abated each citation following the March and May surveys, and ADPH accepted those plans of correction, showing substantial compliance as of April 17, 2025, and July 9, 2025. *See* App. 36-47, 102-141; App. 14-15. Moreover, isolated incidents cannot ipso facto establish failure to substantially comply with applicable regulations. For example, where CMS "only identified one instance where [the facility] did not have sufficient staff to effectively implement resident care plans," CMS had not shown that the facility failed to provide "sufficient numbers of [nursing] personnel … to provide nursing care to all residents." *Golden Living Ctr. - Mountain View v. Sec'y of HHS*, 832 F. App'x 967, 980 (6th Cir. 2020) (alteration in original). Similarly, nursing staff's mistake "in failing to report … relatively minor bruises" and "not investigating more vigorously" a single resident's comment about bruising was not substantial evidence of a failure to substantially comply with applicable requirements. *Grace Healthcare*, 603 F.3d at 421.

As the PCO confirmed, Magnolia Ridge "has taken extensive measures to ensure compliance with regulations and to address the alleged regulatory violations." App. 3. This includes "several leadership changes" and "engag[ing] consultants to assist with education and monitoring." App. 3. Magnolia Ridge has continued to provide safe, quality care to date and has adequate staffing to continue doing so. App. 11-12, 18-19, 23. Here, one-off incidents from months before CMS's decision to terminate do not support a finding that the facility's residents were in immediate jeopardy at the time of CMS's decision, or that Magnolia Ridge failed to substantially comply with applicable regulations for six months.

In all, Magnolia Ridge will likely demonstrate that its substantial compliance requires CMS

to lift the new patient admissions ban instituted in April 2025 and forecloses the path of termination

that CMS has pursued. 42 C.F.R. § 488.454(a) (directing "alternative remedies" until the "facility

has achieved substantial compliance" or the government "terminates the provider agreement").

> **2.    *CMS's termination of the provider agreement and threat to collect pen-
> alties violates the automatic stay.***

Plaintiffs are also likely to succeed in showing that CMS violated the automatic stay by

terminating the Provider Agreement and threatening to collect penalties.

Section 362's automatic stay provision is "one of the fundamental debtor protections pro-

vided by the bankruptcy laws." *In re Elcoteq, Inc.*, 521 B.R. 189, 198 (Bankr. N.D. Tex. 2014)

(quoting *Midlantic Nat'l Bank v. N.J. Dep't of Env't. Prot.*, 474 U.S. 494, 503 (1986)). It "operates

as a self-executing injunction" that "prevents creditors from taking any collection actions against

the debtor or the property of the debtor's estate for pre-petition debts." *Campbell v. Countrywide

Home Loans, Inc.*, 545 F.3d 348, 354-355 (5th Cir. 2008). The automatic stay prohibits, among

other things, "the commencement or continuation … of a judicial, administrative, or other action

or proceeding against the debtor that was or could have been commenced before the commence-

ment of the [bankruptcy] case … or to recover a claim against the debtor that arose before the

commencement of the case." *St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533, 538 (5th

Cir. 2009) (quoting 11 U.S.C. § 362(a)). By barring these actions, the automatic stay "effect[s] an

immediate freeze of the status quo by precluding and nullifying post-petition actions, judicial or

non-judicial, in non-bankruptcy for [or] against the debtor or affecting the property of the estate."

*In re Moss*, 270 B.R. 333, 341-342 (Bankr. W.D.N.Y. 2001) (alteration in original) (quoting *Hillis

Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 585 (9th Cir. 1993)).

**a.**   Plaintiffs will likely show that CMS's unilateral termination of Magnolia Ridge's Pro-

vider Agreement violated the automatic stay. The provider agreement is "property of the estate,"

13

and the automatic stay is a "broad stay of litigation" or other actions "that would affect or interfere with property of the estate, property of the debtor[,] or property in the custody of the estate." *Duncan v. Heinrich*, 591 B.R. 652, 662 (M.D. La. 2018) (citing 3 Collier on Bankruptcy ¶ 362.01 (2018)); *In re Psychotherapy & Counseling Ctr., Inc.*, 195 B.R. 522, 532 (Bankr. D.C. 1996) ("[T]he debtor's rights under the provider agreements to participate in the Medicaid and Medicare provider reimbursement program are properly considered property of the estate. The debtor's rights under the agreement to receive reimbursement payments from government in this program clearly have value to the debtor[.]"); *cf. In re Seven Seas Petrol., Inc.*, 522 F.3d 575, 584 (5th Cir. 2008) (estate property includes "all legal or equitable interests of the debtor in property as of the commencement of the case" (quoting 11 U.S.C. § 541(a)(1))).

CMS sent its Termination Notice after Plaintiffs filed this Petition under Chapter 11 on July 9, 2025 but based it on findings and events that existed prior to the Petition Date. *See* Termination Notice at 1 (asserting that "immediate jeopardy was determined to exist on May 16, 2025"). CMS's termination of Magnolia Ridge's Provider Agreement after the Petition Date is therefore "the commencement… of a judicial [or] administrative … action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title" (11 U.S.C. § 362(a)(1)) and "an act to … exercise control over property of the estate" (*id.* § 362(a)(3)). *See First Am. Health Care of Ga. Inc. v. HHS*, 208 B.R. 985, 987 (Bankr. S.D. Ga. 1996) (enjoining action by HHS to terminate debtor's provider agreements due to accusations of Medicare fraud as a violation of 11 U.S.C. § 362);[3] *see also In re Psychotherapy & Counseling Ctr.*, 195 B.R. at 529-530 (enforcement of HHS's determination "that the debtor should be

---

[3]    Although the *First American* opinion was vacated upon settlement (*First Am. Health Care of Ga., Inc. v. HHS*, 1996 WL 282149 (Bankr. S.D. Ga. Mar. 11, 1996)), courts find its analysis persuasive (*In re Bayou Shores SNF, LLC*, 525 B.R. 160, 166 n.44 (Bankr. M.D. Fla. 2014)).

excluded from the provider program … is … likely to conflict with the bankruptcy court's control over property of the estate"). CMS's termination thus violated the automatic stay.

**b.** For the same reasons, CMS's decision to impose—and threat to immediately collect— civil monetary penalties also violates the automatic stay. Courts have routinely held that the stay in Section 362 "applies to actions by creditors to set off post-petition obligations against pre-peti- tion claims," including when the government acts as a creditor. *Univ. Med. Ctr. v. Sullivan*, 122 B.R. 919, 925 (E.D. Pa. 1990). After all, "[i]t is undisputed that [the government] may not bypass the automatic stay to enforce a monetary judgment." *California ex rel. Brown v. Villalobos*, 453 B.R. 404, 414 (D. Nev. 2011). Although the automatic stay does not prevent the government from "fixing" the amount of a penalty, it does apply when "the government [seeks] ... any sort of en- forcement of that judgment against the debtor." *In re Psychotherapy & Counseling Ctr.*, 195 B.R. at 528. The law is clear: "*anything beyond the mere entry of a money judgment* against a debtor is prohibited by the automatic stay." *In re Halo Wireless, Inc.*, 684 F.3d 581, 587 (5th Cir. 2012). Thus, any attempt CMS might make to collect penalties, including by withholding payments from Magnolia Ridge's reimbursements, would violate the automatic stay. *Cf. In re Kemp*, 52 F.3d 546, 552 (5th Cir. 1995) ("ACS's unilateral action in withholding the $50,000 for its own assurance pending the outcome of the Atkinson lawsuit did not affect the status of those funds as Kemp's pre-petition earned income; neither did that action by ACS magically transmogrify Kemp's own- ership interest in his earnings into a contingency.").

**c.** CMS's actions cannot fall within Section 362(b)(4)'s government regulatory exception because CMS is primarily acting in its own pecuniary interest, not in the interest of the health and safety of Magnolia Ridge's residents. *In re Halo Wireless, Inc.*, 684 F.3d at 588 (government ac- tion not exempt from automatic stay when "the government primarily seeks to protect a pecuniary

15

governmental interest in the debtor's property, as opposed to protecting the public safety and health"). The effect of CMS's termination of the Provider Agreement is not that Magnolia Ridge must close, but that the facility can no longer receive payment for services rendered to Medicare and Medicaid residents. CMS apparently has no qualms about allowing residents to remain at Magnolia Ridge even past October 15, 2025, so long as CMS does not have to pay for their care.

That CMS is not acting in health and safety interests is underscored by the fact that CMS had *other* regulatory options upon a finding of immediate jeopardy, including the appointment of temporary management "to assure the health and safety of the facility's residents." 42 U.S.C. §§ 1395i-3(h)(1)(A), (h)(2)(A)(i), (h)(2)(B)(iii). But CMS did not do so. When the government has other "means and opportunity" to enforce its health and safety regulations but "instead chose[s] to pursue a contractual remedy," the government-regulatory exception in Section 362(b)(4) does not apply. *In re Corporacion de Servicios Medicos Hospitalarios de Fajardo*, 805 F.2d 440, 446 (1st Cir. 1986); *see In re Berkelhammer*, 279 B.R. 660, 666 (Bankr. S.D.N.Y. 2002) ("NYSDH's unilateral action to call a default under the Reinstatement Agreement did not fall within the police and regulatory exception to the automatic stay under section 362(b)(4) of the Bankruptcy Code.").

In *Corporacion*, for example, the debtor contracted with Puerto Rico's health department to operate a hospital. 805 F.2d at 441. The court held that Puerto Rico's attempt to dissolve the hospital's contract was not covered by the exception because Puerto Rico chose to pursue contractual remedies, rather than immediately revoke the hospital's license, which "suggest[ed] … that the threat to the health and safety of the citizens served by the [Hospital] was not as great as appellant would have us believe." *Id.* at 446. CMS's actions here follow the same pattern. Upon a finding of immediate jeopardy, the Secretary has the option to "take immediate action to remove the jeopardy and correct the deficiencies" through the appointment of temporary management "to

16

assure the health and safety of the facility's residents." 42 U.S.C. § 1395i-3(h)(1)(A), (h)(2)(A)(i), (h)(2)(B)(iii). But CMS did not. As in *Corporacion*, when the government has other "means and opportunity" to enforce health and safety regulations but "instead cho[o]se[s] to pursue a contractual remedy," the government-regulatory exception in § 362(b)(4) does not apply. 805 F.2d at 446.

This is all the more evident considering ADPH designated Magnolia Ridge as posing "immediate jeopardy" on May 16, 2025—and Magnolia Ridge then undertook significant remediation efforts *between* May 16, 2025 and August 23, 2025, which neither CMS nor ADPH acknowledges. *See* App. 102-141. The only reasonable inference, then, is that CMS is not acting out of health or safety concerns but instead out of its own pecuniary interest to stop payments.

And even if CMS's action *did* fall under the government regulatory exception (it does not), this Court would still have authority to enter a discretionary injunction under Section 105(a) when the preliminary injunction factors so warrant—and they do, as we describe in sections B to D below. *See In re King Mem'l Hosp., Inc.*, 4 B.R. 704, 709 (Bankr. S.D. Fla. 1980) ("The legislative history of Section 362(b)(4) shows that it was Congress' intent that an exception to the stay is not to make the action immune from injunction."); *In re Commonwealth Cos.*, 913 F.2d 518, 527 (8th Cir. 1990) ("[B]y excepting an act or action from the automatic stay, [§ 362(b)] simply requires that the trustee move the court into action.").

### 3.    *There are no procedural barriers to granting relief.*

**a.**   This Court has jurisdiction to enter relief on Plaintiffs' Complaint because this is a core proceeding under the Bankruptcy Code because Plaintiffs seek to enforce the automatic stay of 11 U.S.C. § 362 and their rights under 11 U.S.C. §§ 363 and 365. *See* 11 U.S.C. § 157; *In re Wood*, 825 F.2d 90, 96-97 (5th Cir. 1987).[4]

---

[4]    The Court has jurisdiction even if this is a non-core proceeding because it "relates to" an existing bankruptcy case. *In re With Purpose, Inc.*, 654 B.R. 715, 726 (Bankr. N.D. Tex. 2023).

**b.** 42 U.S.C. § 405 poses no bar to this Court's jurisdiction over Plaintiffs' claims.

**i.** For Plaintiffs' claims arising under the Bankruptcy Code, Section 405(h)'s jurisdictional bar does not prevent "bankruptcy courts from relying on their general jurisdictional grant found at 28 U.S.C. § 1334(b)." *In re Benjamin*, 932 F.3d 293, 295 (5th Cir. 2019). Because the "plain text" of Section 405(h) "only bars actions under 28 U.S.C. §§ 1331 and 1346[,] it in no way prohibits an assertion of jurisdiction under section 1334." *Id.* at 297 (quoting *In re Town & Country Home Nursing Servs., Inc.*, 963 F.2d 1146, 1155 (9th Cir. 1991)).

Plaintiffs' claim for a violation of the automatic stay provision in 11 U.S.C. § 362 arises under the Bankruptcy Code, and this Court has jurisdiction under 28 U.S.C. § 1334. *See In re THG Holdings*, 604 B.R. 154, 159-160 (Bankr. D. Del. 2019) (explaining that "[b]ecause the only issue is whether the withholding of post-petition reimbursements is a violation of the automatic stay, it is not … inextricably intertwined with pre-petition fiscal reimbursement determinations"); *see also In re Town & Cntry.*, 963 F.2d at 1154 ("[W]here there is an independent basis for bankruptcy court jurisdiction, exhaustion of administrative remedies … is not required.").

Even though the bankruptcy court's "exercise of bankruptcy jurisdiction over property of the estate … might conflict with a decision of the Secretary," "this conflict does not … constitute illegal interference in the administrative process amounting to judicial review." *In re Healthback, LLC*, 226 B.R. 464, 470 (Bankr. W.D. Okla. 1998), *vacated after settlement*, 1999 WL 35012949 (W.D. Okla. 1999). Because "[t]he bankruptcy court is not passing judgment upon the fairness or legality of any decision of the Secretary" by resolving a Bankruptcy Code claim , "[a]ny effect on the administrative decisions is indirect and ancillary" and "not a 'judicial review' of any administrative decision" under Section 405. *Id.* The Court therefore has jurisdiction to enter an injunction under Section 105 to prevent violations of Plaintiffs' rights under the Bankruptcy Code and ensure

18

the orderly progression of these reorganization proceedings, regardless of Section 405.

    **ii.**  The Court also has jurisdiction to consider Plaintiffs' challenge to CMS's decision to terminate the Provider Agreement directly. Section 405(g) "contains two separate elements: first, a 'jurisdictional' requirement that claims be presented to the agency, and second, a 'waivable ... requirement that the administrative remedies prescribed by the Secretary be exhausted.'" *Smith v. Berryhill*, 587 U.S. 471, 478 (2019) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976)); *D&G Holdings, LLC v. Becerra*, 22 F.4th 470, 475 (5th Cir. 2022) (same). Presentment "requires nothing more" than requesting from the agency "the specific relief" sought. *Steigerwald v. Comm'r of Social Sec.*, 48 F.4th 632, 638 (6th Cir. 2022); *see Heckler v. Ringer*, 466 U.S. 602, 617 (1984) ("[R]espondents satisfied the nonwaivable [presentment] requirement by presenting a claim for reimbursement for the expenses of their BCBR surgery."). Plaintiffs satisfied the only jurisdictional requirement—presentment—on September 29, 2025, when Plaintiffs filed a request for a hearing, the first step of the prescribed agency review process, and requested expedited treatment. *See* 42 C.F.R. § 498.40; App. 872-882. The request "identif[ied] the specific issues, and the findings of fact and conclusions of law with which the" Plaintiffs disagreed, 42 C.F.R. § 498.40, and sought "specific relief." *Steigerwald*, 48 F.4th at 638. But the agency has yet to act.

    The urgent relief Plaintiffs seek warrants excusing the non-jurisdictional exhaustion requirement because "a sufficient threat of irreparable harm" may "justify waiver of the administrative exhaustion requirement." *Affiliated Pro. Home Health Care Agency v. Shalala*, 164 F.3d 282, 286 (5th Cir. 1999); *Fam. Rehab., Inc. v. Azar*, 886 F.3d 496, 504 (5th Cir. 2018) ("combined threats of going out of business and disruption to Medicare patients are sufficient for irreparable injury" that would arguably excuse administrative exhaustion); *see In re Heritage Sw. Med. Grp., P.A.*, 309 B.R. 916, 919 (Bankr. N.D. Tex. 2004) ("Courts excuse parties from exhausting the

administrative process if the claim is wholly collateral to a demand for benefits; exhaustion would be futile; or the claimant would suffer irreparable harm if required to exhaust administrative remedies."). Plaintiffs have thoroughly documented that they will likely suffer serious irreparable harm absent immediate judicial review: Plaintiffs' plans for reorganization and possible sale could be undermined, and residents who are currently receiving quality, safe care in their homes will likely be forced to relocate. Plaintiffs have thoroughly documented that they will likely suffer serious irreparable harm absent immediate judicial review: absent relief, interference with Plaintiffs' plans for reorganization and possible sale is likely, and residents who are currently receiving quality, safe care in their homes will likely be forced to relocate. *See infra* at 20-24. These harms warrant excusing administrative exhaustion.

**B.      Plaintiffs will likely suffer serious irreparable harm absent injunctive relief.**

Absent preliminary relief, Plaintiffs and Magnolia Ridge residents will likely suffer substantial, irreparable harm from CMS's termination of the Provider Agreement and threatened collection of CMPs. They will likely experience interference with efforts to reorganize, catastrophic loss of revenues, likely closure, and the mass transfer of residents, all harms that are irreparable.

*First*, CMS's termination of Magnolia Ridge's Provider Agreement will likely cause irreparable harm by "set[ting] a catastrophic chain of events in motion" (*In re Bayou Shores*, 525 B.R. at 164) that will likely affect Plaintiffs' ability to promptly and successfully reorganize. Loss of Medicare and Medicaid receivables at Magnolia Ridge harms Debtors' overall liquidity, in turn harming reorganization efforts. Dkt. No. 922 at 12, 16. More, CMS's termination risks a default on Magnolia Ridge's Master Lease Agreement and Plaintiffs' DIP Credit Agreement. *See* DIP Credit Agreement §§ 6.2(b), 8(d), Dkt. No. 677, Ex. 1. Were that to occur, it could require revisions to the terms of the current stalking horse bid, potentially delay the already-scheduled November 13 auction, and thus interfere with Plaintiffs' ability to successfully reorganize. App. 27-

28; *see* Dkt. No. 685.

Because "Chapter 11 was adopted to give business in financial difficulties an opportunity to reorganize their business affairs, provide repayment to their creditors, and emerge from their bankruptcy case in a financially sound manner," the risk that a debtor will not be able to successfully reorganize constitutes irreparable harm. *In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109, 118 (Bankr. N.D. Tex. 2002); *see also In re Seatco, Inc.*, 257 B.R. 469, 477 (Bankr. N.D. Tex. 2001) (approving a plan of reorganization that included a temporary injunction because "the harm to the Debtor—the inability to successfully reorganize—outweighs the harm" to other creditors from having to wait to collect on certain outstanding liabilities).

Courts have recognized that the severe effects of terminating a Medicare provider agreement during the pendency of Chapter 11 proceedings constitutes irreparable harm to warrant injunctive relief. *See, e.g.*, *In re THG Holdings*, 604 B.R. at 162 (finding that the Debtor "ha[d] shown that it will suffer irreparable harm if the injunction is not issued" to prevent termination because it would be "deprived of a significant portion of its revenues as a result of the withholding of payments post-petition, [and] without those payments True Health will be in default of its DIP financing. The result would be a loss of the ability to reorganize."); *Corporacion*, 805 F.2d at 446 (noting that regulator's decision to "seek direct termination of the contract was also potentially disastrous to the estate" because it "threatened to deprive [the debtor] of its principal asset, jeopardize its only opportunity for reorganization, and force it into chapter 7 liquidation proceedings").

The same is true here. Terminating the Provider Agreement rather than finding substantial compliance to resume full operations would deprive Magnolia Ridge of revenue and interfere with Debtors' ability to successfully reorganize, causing irreparable harm.

*Second*, termination will fully stop the flow of Medicare and Medicaid funds to the

Magnolia Ridge facility effective October 15, 2025. *See* App. 885. Without these essential reve-

nues, in all likelihood Magnolia Ridge will likely have to close. App. 27. Such a closure in turn

result in resident transfers and staff loss of jobs. App. 11, 27-28.

Courts have recognized that CMS's ceasing of payments to a facility "threatens the very

survival of plaintiff's business." *GOS Operator, LLC v. Sebelius*, 2012 WL 175056, at *4 (S.D.

Ala. Jan. 20, 2012) (enjoining termination because the inability to participate in Medicare and

Medicaid and subsequent "[t]ermination of the lease would require all 162 residents at the Gordon

Oaks campus to be transferred elsewhere, and all 157 employees at that location to be laid off").

A "sequence of events" that could lead the facility "to cease operations, go out of business, lose

revenues and residents that could not be recovered, and lose all of the goodwill associated with

operation of its business" was "adequate to establish irreparable harm." *Id.*; *see also Med-Cert

Home Care, LLC v. Azar*, 365 F. Supp. 3d 742, 755 (N.D. Tex. 2019) ("In the Medicare withhold-

ing context, going out of business can be sufficient evidence of irreparable injury.").

That is the case here too: Depleting Magnolia Ridge's revenue, which will likely require it

to cease operations and lose residents and staff, constitutes irreparable harm.

***Third***, residents will have to transfer to other facilities if termination takes effect, interrupt-

ing their care and risking psychological and physical harm. Magnolia Ridge is currently home to

approximately 40 residents who are receiving safe, quality care. App. 11-12, 18. As reflected in

11 U.S.C. § 704(a)(12), residents must be transferred to facilities that, like Magnolia Ridge, "main-

tain[] a reasonable quality of care." Even then, transferring residents can be traumatic, especially

for residents with dementia or other cognitive impairments. App. 18-19. Studies show that reloca-

tion can have "negative physical and psychological effects on long-term care residents," including

an increased risk for resident depression and "elevated mortality risk." App. 18. As Dr. Prince

explains, residents with dementia (which describes approximately 20% of Magnolia Ridge residents) "do not respond well to change in their location, living arrangements, and other circumstances," and "it would be far better for such patients to stay at Magnolia Ridge." App. 19.

Courts have recognized that "the interests of health care providers and Medicare beneficiaries are closely intertwined," such that irreparable harm to residents constitutes harm to the provider as well. *Int'l Long Term Care v. Shalala*, 947 F. Supp. 15, 18 (D.D.C. 1998); *see also Mediplex of Mass., Inc. v. Shalala*, 39 F.Supp.2d 88, 98-99 (D. Mass. 1999) (noting that Mediplex has an interest in protecting the health of its residents and may assert harm to them as irreparable harm for the purpose of a preliminary injunction motion, and that the potential for "transfer trauma, a condition which commonly afflicts nursing home residents who are suddenly forced to vacate familiar surroundings and can even cause death" justified granting a preliminary injunction).

The circumstances here are indistinguishable from those in *International Long Term Care*. The Court found of deep concern that the facility "might well [have been] forced to close its doors, and the residents might have [to have been] transferred" while the facility challenged the termination decision on the merits. 947 F. Supp. 15 at 18. Even if the agency decisionmaker eventually concluded that the provider "should not be terminated from the Medicare program," by that point, it may have been "too late" for the facility's business to recover, and "the residents [would] have already undergone an unnecessary and potentially destructive transfer from which many of them may sustain significant physical or psychological trauma." *Id.* at 19. That was "just the sort of irreparable and unnecessary harm that carefully tailored, limited injunctive relief is intended to prevent." *Id.* at 18; *see also GOS Operator*, 2012 WL 175056, at *4-5; *Oak Park Health Care Ctr., LLC v. Johnson*, 2009 WL 331563, at *3 (W.D. La. Feb. 10, 2009) (granting injunction because "[t]erminating provider benefits to a nursing home would require an extremely vulnerable

population to undergo the trauma of moving to a new facility"); *see also In re Bayou Shores*, 525 B.R. at 164 (granting an injunction to prevent "the transfer of the Debtor's patients, many of whom would have had no place to go or would have potentially been harmed by the transfer").

Plaintiffs and Magnolia Ridge residents will suffer irreparable harm absent relief.

**C.     The balance of equities and public interest favors the requested injunction.**

The balance of equities tips decidedly in favor of injunctive relief. *In re Chiron Equities, LLC*, 552 B.R. 674, 700 (Bankr. S.D. Tex. 2016).

Any conceivable harm to CMS pales in comparison to the serious irreparable harms that Plaintiffs and Magnolia Ridge residents will face if the termination is allowed to take effect. CMS has already committed to paying for residents' care through October 15, 2025, and Plaintiffs have fully abated the incidents that surveyors noted. Nor is CMS's interest in terminating providers that violate regulatory requirements automatically sufficient to outweigh the harms to Plaintiffs and residents. *See In re THG Holdings*, 604 B.R. at 162 (rejecting argument that the government's "strong interest in protecting the Medicare system from financial loss and fraud" outweighed the plaintiffs' interest); *see also Med-Cert*, 365 F. Supp. 3d at 757 (although "an injunction will delay the government's ability to recoup any overpayments," government would later be able to recoup those payments if it is successful on the merits of its claim); *Adams EMS, Inc. v. Azar*, 2018 WL 5264244, at *11 (S.D. Tex. Oct. 23, 2018) (same). CMS's interest in safeguarding its own pecuniary interest cannot outweigh the serious and immediate harm to Plaintiffs and residents that would occur if the reorganization were jeopardized and if Magnolia Ridge were forced to close.

An injunction is also in the public interest because preserving residents' access to healthcare benefits them and the public writ large. *See, e.g.*, *Fruth, Inc. v. Pullin*, 2015 WL 9451066, at *8 (S.D.W. Va. 2015) (injunction "serve[d] the public interest" because it would "permit Medicare and Medicaid recipients to access pharmaceuticals provided by [plaintiff] during the

pendency of this proceeding"); *Tex. Child.'s Hosp. v. Burwell*, 76 F. Supp. 3d 224, 246 (D.D.C. 2014) (there is a "robust public interest" in safeguarding access to healthcare for federal beneficiaries).

To the extent CMS may claim that it is attempting to exercise its police powers and protect residents from harm, that argument falls flat. For one, Magnolia Ridge has undertaken significant efforts to abate the surveyed issues, and Magnolia Ridge is currently providing safe and adequate care. *See supra* at 4-6, 9-11. An injunction does nothing to impede CMS's or ADPH's rights to survey Magnolia Ridge or undertake lesser remedial action to ensure health and safety of residents; it would only ensure that Magnolia Ridge may continue operating to serve its residents.

## CONCLUSION

As demonstrated above, Plaintiffs are likely to prove that CMS's termination is unlawful because there is no immediate jeopardy and because they are in substantial compliance; moreover, the termination violated the automatic stay. Yet, absent relief from this Court, Plaintiffs and Magnolia Ridge residents will likely suffer serious irreparable harms that tip the equity balance decidedly in their favor. The Court should therefore direct the following relief preliminarily:

- staying termination of the Provider Agreement;

- enjoining any CMS interference with readmitting residents who left Magnolia Ridge due to CMS's unlawful termination but wish to return;

- staying CMS's enforcement of a ban on new resident admissions because Magnolia Ridge is likely to succeed in demonstrating substantial compliance and that—as a result—an admission ban remedy must be lifted (42 C.F.R. § 488.454(a)); and

- enjoining any withholding of CMPs from Magnolia Ridge's reimbursements.

The Court should grant this motion and enter the requested preliminary injunctive relief.

Dated:  September 30, 2025

Respectfully submitted,

/s/ *Daniel M. Simon*

Paul W. Hughes (*pro hac vice* to be filed)
Sarah P. Hogarth (*pro hac vice* to be filed)
Grace Wallack (*pro hac vice* to be filed)
Aleena Ijaz (*pro hac vice* to be filed)
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8988
phughes@mwe.com

Matthew L. Knowles (*pro hac vice* to be filed)
MCDERMOTT WILL & SCHULTE LLP
200 Clarendon Street, Floor 58
Boston, MA 02116
(617) 535-4000
mknowles@mwe.com

Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Catherine T. Lee (admitted *pro hac vice*)
Landon W. Foody (admitted *pro hac vice*)
MCDERMOTT WILL & SCHULTE LLP
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
(312) 372-2000
dsimon@mwe.com

Marcus A. Helt (TX 24052187)
Jack G. Haake (TX 24127704)
MCDERMOTT WILL & SCHULTE LLP
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201
(214) 295-8000
mhelt@mwe.com

*Attorneys for Plaintiffs and Debtors-in-Possession*

**CERTIFICATE OF SERVICE**

I hereby certify that on this date a true and correct copy of the foregoing was served by the Court's CM/ECF system on all counsel of record registered in these Chapter 11 Cases through CM/ECF.  The Debtors' claims and noticing agent will be filing a supplemental certificate of service on the docket to reflect any additional service of the foregoing.

Dated: September 30, 2025                    /s/ *Daniel M. Simon*
                                                      Daniel M. Simon